# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 7, 2011

Lyle W. Cayce
Clerk

No. 09-10916

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JULIAN OLGUIN, JR.; ROBERT LOSOYA, also known as Minnesota;
JUAN ANTONIO LEDESMA; HECTOR DANIEL MACIAS,

Defendants - Appellants

Appeals from the United States District Court
for the Northern District of Texas, Forth Worth Division

Before GARZA, STEWART, and HAYNES, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Defendants-Appellants Julian Olguin, Jr. ("Olguin"), Robert Losoya ("Losoya"), Juan Antonio Ledesma ("Ledesma"), and Hector Daniel Macias ("Macias") (collectively "Appellants") bring this appeal challenging criminal convictions related to an enterprise to conspire, possess and distribute controlled substances. We AFFIRM.

## I.

The facts of this case are largely undisputed. In early 2007, a traffic stop by Fort Worth, Texas police led to a drug seizure, which yielded an informant

No. 09-10916

willing to make recorded telephone calls with a member of a Texas gang syndicate regarding drug transactions. Subsequent wiretaps implicated several members of the syndicate, including Losoya.

On June 4, 2008, Drug Enforcement Agency ("DEA") Task Force agents received a tip from a confidential source ("CS") that a major drug transaction was to take place at 1265 East Berry ("Berry Lot") in Fort Worth, Texas. The CS told the DEA that a semi-tractor trailer loaded with marijuana would arrive at the Berry Lot, at which point a U-Haul truck would then take possession of the marijuana. The load of the marijuana was packed in twenty-five large bundles, totaling 2,010.65 pounds.

Based on the tip from the CS, DEA agents set up surveillance on the Berry Lot. The agents observed Ledesma driving a semi-tractor trailer, followed by a U-Haul driven by Olguin, and a sedan driven by Macias. DEA personnel observed Olguin park next to Ledesma and meet with Macias. DEA agents then converged on the scene during the meeting, approached the car with drug-sniffing dogs, and discovered the contents of the semi-tractor trailer. When asked for their reasons for being at the Berry Lot, all three provided mildly incredulous answers. Officers arrested all three.

Further investigation continued through phone records. Losoya was identified through 173 drug-related conversations and was subsequently identified as a leader of the trafficking enterprise. The recorded phone calls indicated that Losoya recruited members to the conspiracy, received money, gave orders, obtained firearms, and transported various types of drugs. Losoya was also arrested.

On November 19, 2008, a grand-jury in the Northern District of Texas charged the Appellants, along with thirty-one others, in a ninety-eight count superseding indictment. Most of the others implicated pled guilty; a few remained fugitives. Count 1 of the indictment charged Olguin, Ledesma,

2

No. 09-10916

Macias, and Losoya with conspiracy to distribute a controlled substance and to possess a controlled substance with intent to distribute, in violation of 21 U.S.C. § 846 and 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).  Count 11 of the indictment charged Olguin, Ledesma, and Macias with possession of a controlled substance with the intent to distribute and aiding and abetting, based on the contents of the semi-tractor trailer.  Losoya was additionally charged with two firearms charges and twenty-eight other charges.

At the close of the Government's case, the district court denied each Appellant's motion for judgment of acquittal as to the conspiracy charge.  After a jury trial, all four were convicted of Count 1.  Olguin, Macias, and Ledesma were convicted of Count 11.  Losoya was additionally convicted of all but one of the remaining thirty counts pending against him.  Prior to sentencing, but after the jury delivered its convictions, Losoya was found to have authorized "mulettas" or "hits" (calls for murder) from behind prison, against those who cooperated with the Government.

Post-conviction, Appellants waived a jury trial on asset forfeiture.  The Government's evidence indicated that the total amount of the money attributable to the criminal enterprise was $12 million. The Government moved the court for asset forfeiture judgments of $2 million against each Appellant. The district court granted the Government's motion and found each of the four jointly and severally liable for $2 million.  Along with their forfeiture judgment, each defendant was sentenced to prison time.  Ledesma was sentenced to 136 months' imprisonment, Olguin to 120 months' imprisonment, and Macias to 264 months' imprisonment.  With respect to Losoya, the district court adopted the Pre Sentence Report's ("PSR") recommendation of 480 months, over Losoya's objections.  Inherent in the term were two enhancements: one for Losoya's role as a leader/organizer of the conspiracy; the second enhancement was for obstruction of justice.  This appeal followed.

3

No. 09-10916

## II.

On appeal, Ledesma challenges the district court's admission of certain Federal Rule of Evidence 404(b) testimony, and the district court's admission of phone records. Macias challenges the district court's admission of phone calls and transcripts of calls as a violation of his rights under the Confrontation Clause. Ledesma and Macias challenge the sufficiency of the evidence to support the conspiracy charge. Olguin challenges as error the district court's forfeiture judgment against him. Together, Ledesma and Olguin challenge the district court's finding of joint and several liability for $2 million. Ledesma and Losoya also challenge the district court's calculation of the liability amount, $2 million. Lastly, Losoya challenges the two sentencing enhancements added to his base offense level at sentencing.

## A.

At trial and pursuant to Rule 404(b), the Government introduced evidence of Ledesma's involvement in two prior drug transactions to demonstrate Ledesma's intent and knowledge regarding the contents of the semi-tractor trailer that he was driving shortly before his arrest at the Berry Lot. In 2003, Ledesma was arrested at a border check-point in Laredo, Texas after pounds of marijuana were detected by drug-sniffing dogs and indeed found in his tractor trailer. The Government introduced evidence of the 2003 incident through the testimony of a Border Patrol agent and photographs of the contents of the trailer. In 2006, after a routine traffic stop, police discovered $381,600 in cash hidden in the speakers of a tractor trailer driven by Ledesma. Then, too, Ledesma was arrested. On both occasions, controlled substances were found in Ledesma's vehicles.

Ledema argues that the admission of the two prior drug transactions was unduly prejudicial and that the Government had other evidence to show knowledge and intent. The Government contends that the district court properly

4

admitted evidence of the prior arrests because Ledesma's counsel denied Ledesma's intent and knowledge regarding the contents of the semi-tractor trailer.

We review the admission of Rule 404(b) evidence for an abuse of discretion with a heightened review in criminal cases. *United States v. Pompa*, 434 F.3d 800, 805 (5th Cir. 2005). Such a review demands that the evidence be strictly relevant to the particular offense charged. *United States v. Hawley*, 516 F.3d 264, 266 (5th Cir. 2008). Rule 404(b) indicates that "'Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.' But such evidence is 'admissible for other purposes such as proof of motive, opportunity, *intent*, preparation, plan, *knowledge*, identity, or *absence of mistake or accident*.'" *Id.* at 267 (citing FED. R. E. 404(b))(emphasis added).

In *United States v. Beechum*, this court outlined a two-pronged test to determine if an abuse of discretion occurred with respect to the admission of Rule 404(b) testimony. 582 F.2d 898, 911 (5th Cir. 1978) (en banc); *see also United States v. McCall*, 553 F.3d 821, 827 (5th Cir. 2008). First, "it must be determined that the extrinsic evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of [R]ule 403." *Beechum,* 582 F.2d at 911. Evidence is relevant "if it has the tendency to make the existence of any" consequential fact "to the determination of the action more or less probable than it would be without the evidence." FED. R. E. 401.

This court has held that evidence of prior acts is admissible to establish a defendant's intent and knowledge. *United States v. Arnold*, 467 F.3d 880, 885 (5th Cir. 2006). A defendant's not-guilty plea intuitively puts his intent and

No. 09-10916

knowledge into issue. *McCall*, 553 F.3d at 828. Here, under the two-pronged *Beechum* test, the district court properly admitted the evidence.

First, the Government introduced the evidence not to demonstrate his character, but rather his intent or knowledge of drugs in the trailer. As the Government correctly indicates, the district court specifically noted intent and knowledge in determining the relevancy of the past events. Thus, they were probative to an issue other than his character, and thereby satisfy the first prong of this court's framework under *Beechum*. Moreover, any prejudicial effect is significantly outweighed by the probative value, for at least two reasons.

First, the district court offered a curative statement. This court has held that such an instruction cures any impropriety, or inference of impropriety, in the admission of prior bad acts evidence. *See, e.g., United States v. Willis*, 6 F.3d 257, 262 (5th Cir. 1993). Next, the independent evidence related to Ledesma's instant arrest makes clear that the introduction of the evidence was not overly prejudicial. Here, Ledesma was arrested after law enforcement observed him driving a vehicle with over a ton of marijuana. The buildup to the arrest yielded evidence in the form of foundational wiretaps that supported the notion that Ledesma's involvement in the trafficking enterprise was not insignificant. Thus, the *Beechum* standard does not undermine the admission of the Rule 404(b) evidence and the district court did not err.

**B.**

Ledesma next protests that the district court abused its discretion by admitting phone records, over Ledesma's objection for lack of notice, in violation of Federal Rule of Evidence 902(11). The Government, meanwhile, contends that the district court did not abuse its discretion in admitting phone records because it is undisputed that the Government produced phone records six months before trial, a supplemental business record five days before trial and, thus, complied fully with Rule 902(11).

No. 09-10916

We assess the admission of evidence pursuant to Rule 902(11) under an abuse of discretion standard. *United States v. Brown*, 553 F.3d 768, 793 (5th Cir. 2008). If an abuse of discretion is discovered, the abuse is scrutinized under the harmless error doctrine. *United States v. Clark*, 577 F.3d 273, 287 (5th Cir. 2009). In such a scenario, reversible error occurs only when the admission of evidence substantially affects the rights of a party." *Id.* An error affects substantial rights only if it affected the outcome of the district court's proceedings. *United States v. Davis*, 487 F.3d 282, 284 (5th Cir. 2007).

Federal Rule of Evidence 902(11) provides that "a party intending to offer a record into evidence . . . must provide written notice of that intention . . . and must make the record available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them." FED. R. E. 902(11)(c). While the rule does not establish what constitutes a fair amount of time, the time must be of such a duration so that the "affidavit can be vetted for objection or impeachment in advance." *Brown*, 553 F.3d at 793.

Ledesma's complaint of reversible error is born out of the district court's admission of phone records. Specifically, he claims that the Government did not provide proper notice before introducing the records at trial. Yet, a review of the record establishes that the Government complied with the requirements of Rule 902(11) to the district court's satisfaction and to an extent that satisfies appellate review.

Ledesma's counsel received the records in December 2008, six months before trial. Five days before trial, the Government provided written notice to introduce the phone records. At trial, the Government indicated that an affidavit was included with the records received in December 2008. To the court, this time-span satisfied *Brown*'s vetting requirements.

No. 09-10916

Despite this, Ledesma persists and argues that *Brown* supports his position. There, this court affirmed convictions of pharmacists for various offenses related to distributing medicines under the cover of false prescriptions. *Brown*, 553 F.3d at 780. In *Brown*, we did not find an abuse of discretion in the district court's decision to deny the defendants' requests to introduce pharmacy records, which defendants first made available during trial. *Id.* at 792.

*Brown* does not stand for the proposition that Ledesma asserts. In *Brown*, the district court's refusal to admit the business records was due to the defense's inability to present a qualified witness to lay the foundation as to their admission. *Id.* Not only was a qualified foundation witness unavailable, but also that district court and this court on appellate review concluded that the affidavit was untimely. *Id.* at 793.

Here, the availability of a foundational witness is not at issue. Moreover, the district did not find error in the timeliness of the Government's transfer of business records, nor did the district court find untimely the Government's notification of its intent to introduce the affidavit. Thus, Ledesma's protests that *Brown* is similar to this case is unavailing. Here, the Government made the records available in a timely manner and to the district court's—and this court's—satisfaction. The admission of the records did not constitute reversible error, and any complained-of potential error would be harmless. No error that could conceivably affect Ledesma's rights is discernible. As such, the admission of the phone records, and their timeliness, does not constitute reversible error.

## C.

Macias alleges that the district court erred in admitting, over objection, phone calls and transcripts of calls, in violation of his rights under the Confrontation Clause. Macias avers that the statements elicited from these calls were out-of-court hearsay. The Government argues that the district court's admission of the phone calls and transcripts of calls did not violate Macias's

rights under the Confrontation Clause because testimony reasonably established the identities of the participants on the call. Moreover, the Government alleges that because the calls in question did not implicate Macias, he had no Confrontation Clause rights related to the exhibits.

We review challenges based on the Confrontation Clause de novo. *United States v. Bell*, 367 F.3d 452, 465 (5th Cir. 2004). In the absence of a Sixth Amendment violation, we review the limitation for an abuse of discretion. *United States v. Jimenez*, 464 F. 3d 555, 558–59 (5th Cir. 2006).

"A defendant's right to cross-examine witnesses against him is a . . . right secured by the Confrontation Clause of the Sixth Amendment." *United States v. Davis*, 393 F.3d 540, 548 (5th Cir. 2004) (citing *United States v. Mayer*, 556 F.2d 245, 248 (5th Cir. 1977)). It thus follows that a judge's discretionary authority "comes into play only after there has been permitted as a matter of right sufficient cross examination to satisfy the Sixth Amendment." *United States v. Restivo*, 8 F.3d at 274, 278 (5th Cir. 1993) (internal citations and quotations omitted). The Confrontation Clause is satisfied when defense counsel has been allowed to expose the jury to facts from which the jury could appropriately draw inferences relating to the reliability of the witness. *Id.* To demonstrate an abuse of discretion, the defendant must show that the limitation was clearly prejudicial. *Id.* Put differently, a defendant must show that a reasonable jury might have had a significantly different impression of witness credibility if defense counsel had been allowed to pursue the questioning. *United States v. Maceo*, 947 F.2d 1191, 1200 (5th Cir. 1991).

Here, the evidence to which Macias objects is the admission of recorded conversations between Losoya and other unidentified persons, purportedly in furtherance of the conspiracy. He claims that the lack of identity of those speaking with Losoya would render impossible his ability to confront and examine such persons. Macias's argument fails for a number of reasons.

First, the calls do not implicate Macias, instead they implicate Losoya. In fact, Macias does not even contend that the calls implicate him. The Sixth Amendment guarantees the right to confrontation against a party testifying against him, not against others. Put differently, the violation (if any) offends Losoya's rights, and it was Losoya's duty to bring the action to remedy the violation of *his* rights. Thus, Macias does not have any basis to allege a violation. This distinction is amplified when considering that Macias is not listed as a speaker, and transcripts of the calls do not identify him as a speaker.

As to the substance of Macias's complaint, this court has held "*Crawford* bars only statements that are testimonial." *United States v. King*, 541 F.3d 1143, 1145 (5th Cir. 2008) (citing *Crawford v. Washington*, 541 U.S. 36, 678 (2004)). "Statements made between co-conspirators in furtherance of a conspiracy are not testimonial." *King*, 541 F.3d at 1145–46.

Moreover, the Government identified the speakers to the district court's satisfaction and in a manner that survives appellate review. As the federal rules prescribe, "identification . . . as a condition precedent [to admission] is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. E. 901(1). The Government alleges that authentication was established through the testimony of a police officer who spoke to defendants, *United States v. Bush*, 405 F.3d 909, 918 (10th Cir. 2005), and through circumstantial evidence. *Palos v. United States*, 416 F.2d 438, 440 (5th Cir. 1969).

Here, authentication was done by two FBI Agents. These agents testified that they identified the callers through a variety of methods, including self-identification, identification by others, and surveillance. Because the standard of certainty as to speakers' identities is one of reasonableness, *United States v. Wong Kim Bo*, 466 F.2d 1298, 1302 (5th Cir. 1972), and our review confirms the reasonableness of the identification procedures, the district court did not err in

admitting the calls and transcripts. Thus, we find no Confrontation Clause violation.

The absence of a Confrontation Clause violation invites review of the limitation for an abuse of discretion, pursuant to *Jimenez.* 464 F. 3d at 558–59. As we stated earlier, abuses of discretion are examined pursuant to the harmless error doctrine, *Clark*, 577 F.3d at 277, and reversible error occurs only when the admission of evidence affects the substantial rights of a party. *Id.* This occurs only if it affected the outcome of the district court proceedings. *Davis*, 487 F.3d at 284.

Just as we cannot pinpoint a Confrontation Clause violation suffered by Macias by the admission of this evidence, we similarly cannot say that its admission affected the outcome of the proceedings. The calls in question do not implicate Macias and the identities of the speakers were authenticated to this court's satisfaction. Thus, as the Government avers, even if the district court admitted the phone calls and transcripts in error, the error was harmless and not prejudicial. Accordingly, this court finds no error by the district court on this issue.

## D.

Ledesma and Macias next argue that the district court erred in denying their motion for judgment of acquittal on the conspiracy charge as well as the possession charge. Macias argues that there was insufficient evidence to show that he conspired to possess and distribute the contraband. Moreover, he contends that there was no evidence of any affirmative act to prove a conspiracy. Ledesma, meanwhile, argues that the Government presented evidence of two conspiracies—the charged conspiracy and a second conspiracy. Ledesma contends that he participated only in the uncharged conspiracy, and the district court's failure to grant his motion for judgment of acquittal was erroneous.

No. 09-10916

For its part, the Government argues that the evidence presented was in fact sufficient. The Government contends that it presented significant physical and electronic evidence to support the convictions. As for Ledesma's assertion that he was charged with involvement in the wrong conspiracy, the Government maintains that Ledesma was charged in the correct conspiracy because he, like the others, shared the common goal of selling drugs for profits, the nature of the drug scheme was advantageous, and the participants significantly overlapped.

Since both Ledesma and Macias moved for judgment of acquittal at the close of the case, both preserved their sufficiency claims for appellate review. *United States v. Ferguson*, 211 F.3d 878, 882 (5th Cir. 2000). In such a case, appellate courts review a denial of a motion for acquittal de novo. *United States v. Fuchs*, 467 F.3d 889, 904 (5th Cir. 2006). Accordingly, this court reviews to determine whether a rational jury could have found the essential elements of the offense beyond a reasonable doubt. *United States v. Lopez-Moreno*, 420 F.3d 420, 437–38 (5th Cir. 2005). The court does "not evaluate the weight of the evidence or the credibility of the witnesses, but view[s] the evidence in the light most favorable to the verdict, drawing all reasonable inferences to support the verdict." *United States v. Delgado*, 256 F.3d 264, 273–74 (5th Cir. 2001).

To establish a conspiracy to distribute a controlled substance, the Government must prove beyond a reasonable doubt: "(1) the existence of an agreement between two or more individuals to violate the narcotics laws; (2) the defendant's knowledge of the agreement; and (3) his voluntary participation in the conspiracy." *United States v. Valdez*, 453 F.3d 252, 256–57 (5th Cir. 2006). "The jury can infer a conspiracy agreement from circumstantial evidence . . . and may rely upon the defendant's presence and association, along with other evidence, in finding that a conspiracy existed." *United States v. Robles-Pantoja*, 887 F.2d 1250, 1254 (5th Cir. 1989). Mere presence alone is insufficient to establish a conspiracy, but may serve as one factor upon which a jury may rely

12

No. 09-10916

in finding a defendant's involvement in a conspiracy. *United States v. Maltos*, 958 F.2d 743, 746 (5th Cir. 1992)

To establish the offense of possession of a controlled substance with intent to distribute, the Government must prove beyond a reasonable doubt that a person had: (1) knowledge, (2) possession of a controlled substance, and (3) intent to distribute the controlled substance. *See Delgado*, 256 F.3d at 274. Distribution includes acts in furtherance of transfer, sale, or delivery. *United States v. Lechuga,* 888 F.2d 1472, 1478 (5th Cir. 1989).

### 1.

Here, the meeting at the Berry Lot goes a long way in establishing Ledesma's and Macias's knowledge of an existing conspiracy and their voluntary participation in it. Yet, as *Maltos* prescribes, presence is not enough. The record shows that Ledesma and Macias met with convicted and confessed co-conspirators. One such confessed co-conspirator testified that he saw the two at similar drug transactions. Moreover, phone records show scores of telephone calls between Macias and a drug supplier on the day of the Berry Lot transaction. Macias also spoke to his brother after his arrest about hiding certain items, which could implicate Macias, namely cash and a drug ledger. A subsequent police search yielded the very items Macias and his brother sought to conceal—a money counter, a high capacity scale, a manual scale, and packaging material. Also found was the drug ledger that was the subject of the Macias Brothers' conversation. Macias's culpability in the conspiracy, as well as his guilt for possession of the controlled substances, were supported by the evidence. Thus, the district court did not err in denying Macias's motion for judgment of acquittal.

### 2.

Similarly, the district court did not err in denying Ledesma's motion. Ledesma argues that the sheer number of people involved in the investigation

No. 09-10916

and the number of communications between alleged co-conspirators makes his relatively minor role in the conspiracy inconsequential. For example, he cites the fact that there were over 8,000 phone calls intercepted by court-authorized wire-taps and that he was not a speaker in any of these calls. He further asserts that he was only present at one of forty-seven meetings at which co-conspirators met, and that none of the seven alleged co-conspirators that did testify mentioned Ledesma by name. Ledesma argues that if he was a member of a conspiracy, it was not the one at the heart of the trafficking enterprise in question.

The question of the existence of the number of conspiracies is determined by looking for a common goal or purpose, the nature of the scheme, and overlapping participants in various dealings. *United States v. Franklin*, 561 F.3d 398, 402 (5th Cir. 2009); *see also United States v. Morrow*, 177 F.3d 272, 291 (5th Cir. 1999).

Here, the common goal is evident: the distribution of drugs in the Dallas/ Fort Worth area. The record supports the assertion that the Appellants purchased marijuana with the intent to sell for a profit. Moreover, the nature of the scheme supports one conspiracy. Examining only the scene at the Berry Lot, a reasonable juror could infer that Ledesma's job was to drive the drugs to the lot; it would then be transferred to Olguin's U-haul, while Macias supervised and/or assisted. The record also supports the inference that the three at the scene conferred before the transfer, and in the moments immediately before their arrest. The existence of a single conspiracy will be inferred where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect or to the overall success of the venture, where there are several parts inherent in a common plan. *United States v. Mitchell*, 484 F.3d 762, 770 (5th Cir. 2007). Such is the case here.

14

No. 09-10916

Lastly, the conspiracy had overlapping participants. For one, Olguin, Ledesma, and Macias were arrested together. Moreover, an additional co-conspirator, Alvaro Garza, testified that he was to meet Ledesma that day, but left when he saw the police. Calls between other co-conspirators also referenced Ledesma's load of the contraband.

Taken together, this supports the jury's finding of a conspiracy and this court will leave undisturbed the convictions for conspiracy. The fact remains that Macias and a known drug supplier exchanged scores of phone calls, over a dozen of which were on June 4, 2008, the day of the Berry Lot transaction. Moreover, phone records reflect that Macias and Ledesma were in contact with the same numbers repeatedly. Most damning for Ledesma is that he was arrested driving a semi-tractor trailer stocked with over a ton of marijuana. Accordingly, the district court did not err when it denied Macias's and Ledesma's motions for judgment of acquittal.

**E.**

We turn next to the district court's asset forfeiture judgment. This court reviews the district court's legal conclusion as to the propriety of a forfeiture order de novo. *United States v. Taylor*, 582 F.3d 558, 565 (5th Cir. 2009). This court reviews the district court's findings of fact under the clearly erroneous standard of review, and the question of whether those facts constitute legally proper forfeiture de novo. *United States v. Marmolejo*, 89 F.3d 1185, 1197 (5th Cir. 1996).

The district court's asset forfeiture judgment invites appeals from the defendants on three issues: (1) whether 28 U.S.C. §853 permits the imposition of money judgments against Olguin; (2) whether each defendant was jointly and severally liable for the full proceeds of the conspiracy; and, (3) whether the district court erred in determining the forfeiture amount based on the gross, and not the net, proceeds of the conspiracy. We consider each issue.

15

No. 09-10916

**1.**

Olguin argues that the district court erred in assessing a personal judgment because, when in the absence of the ill-gotten goods, 21 U.S.C. § 853 does not authorize personal money judgments for offenses in violation of the Drug Abuse Prevention and Control Act ("DPACA"). The Government contends that § 853 permits money judgment against *each* Appellant as part of his sentence in drug conspiracy cases and contemplates the forfeiture of gross proceeds of the conspiracy.

This issue has never been directly addressed by this court. That said, a review of the Comprehensive Forfeiture Act ("CFA"), 21 U.S.C. § 853, supports our conclusion that the district court did not err in its treatment of the issue. As is the case whenever we are confronted with a matter of statutory interpretation, we look first to the plain meaning of the statute. The text of the CFA is plain and unambiguous, and we handle it according to its plain meaning. *See Carcieri v. Salazar*, 129 S.Ct. 1058, 1064 (2009); *United States v. Monsanto*, 491 U.S. 600, 609 (1989).

The CFA provides that a defendant convicted of the crimes such as those at issue here shall forfeit "any property constituting or derived from any proceeds the person obtained, directly or indirectly, as the result of such violation." 21 U.S.C. § 853(a). This chapter of the federal code is to be construed liberally in "order to effectuate its remedial purposes." 21 U.S.C. § 853(o). Subject to this statute's scope is "all property" . . . including "real property . . . tangible and intangible personal property, including rights, privileges, interests, claims and securities." 21 U.S.C. § 853(b). Should assets be unavailable, "courts are authorized to "order the forfeiture of any other property of the defendant, up to the value of any property." 21 U.S.C. § 853(p). The language of the statute is decidedly broad, and we keep this breadth in mind while examining caselaw that has interpreted the CFA.

16

No. 09-10916

In *Monsanto*, the Supreme Court considered an appeal of a defendant charged and convicted for violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"). 491 U.S. at 609. Monsanto was charged for his direction of a large-scale heroin distribution enterprise. *Id.* at 602. Prior to trial and pursuant to the entry of the Government's indictment, the district court in *Monsanto* issued a restraining order freezing certain assets—a home, an apartment, and $35,000 in cash. *Id.* at 603. Monsanto challenged the entry of the order, raising statutory arguments, and alleging the asset freeze order "interfered with his Sixth Amendment right to counsel of choice." *Id.* at 604.

The district court denied his application and a panel of the Second Circuit affirmed. *Id.* at 605. An en banc Second Circuit reversed, and ordered the district court to modify its order to permit the restrained assets to be permitted to be used to pay attorney's fees. *Id.* at 605–06. The Supreme Court reversed the en banc Second Circuit. *Id.* at 606.

In discussing the breadth of the statute, the Court rejected Monsanto's argument that because Congress simply did not consider the prospect that forfeiture would reach the assets that could be used to pay for an attorney, that the court should create an exception to the CFA because legislative history was silent on the issue. *Id.* at 608. The Court explained that silence "does not demonstrate ambiguity . . . *it demonstrates breadth.*" *Id.* at 609 (internal quotation marks omitted) (emphasis added). "[Section 853(a)] is broad and unambiguous . . . and Congress' failure to supplement [it] with [qualifiers] does not lessen the force of the statute's plain language." *Id.* The Supreme Court explained that "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to explain *what* was to be forfeited." *Id.* at. 607 (emphasis added).

We find *Monsanto's* reasoning persuasive. If the court in *Monsanto* did not create an exception for money, irrespective of how the money is to be used

17

(attorney's fees or otherwise), we are similarly reluctant to create an exception for Olguin's personal money. Our reticence finds refuge in the CFA's defining sections, which, as explained above, defines property as "real property . . . [and] tangible and intangible personal property." *Id.* (quoting 21 U.S.C. § 853 (b)).

Thus, it appears to the court that *Monsanto* forecloses the very argument Olguin purports to make: "the [CFA] is unambiguous in failing to exclude assets that could be used to pay an attorney." *Id.* We conclude this same unambiguous language reaches Olguin's assets, irrespective the purposes for which Olguin had his money earmarked. This includes the money Olguin attempts to immunize from the court's forfeiture judgment because, after all, the CFA is to be "liberally construed to effectuate its remedial purposes." 21 U.S.C. 853(o). "The text of the relevant statutory provisions makes clear that Congress conceived of forfeiture as punishment for the commission of various [drug crimes]." *Libretti v. United States*, 516 U.S. 29, 39 (1995). The CFA's broad language, coupled with *Monsanto's* correspondingly expansive interpretation, evinces a Congressional mandate to reach the ill-gotten resources of the putative criminal, in this case Olguin.

This conclusion is no different because the illegally-obtained assets cannot be located. *See United States v. Casey*, 444 F.3d 1071, 1074 (9th Cir. 2006). In *Casey*, the defendant was indicted and subsequently pled guilty to distributing controlled substances. After the district court denied the Government's application to impose a forfeiture money judgment, the Ninth Circuit reversed, and held that CFA money judgments were not improper. After citing the broad language of the CFA, as well as reciting all that encompasses "property" under the CFA's defining provisions, *id.* at 1073, the Ninth Circuit recognized that the CFA's remedial purposes were satisfied by "ensuring that all eligible criminal defendants receive the mandatory forfeiture sanction Congress intended and disgorge their ill-gotten gains, even those already spent." *Id.* at 1074.

As the Government avers, every circuit that has considered the issue has held contrary to the argument Olguin makes here. *United States v. McGinty*, 610 F.3d 1242, 1246 (10th Cir. 2010)("We . . . conclude that . . . money judgments are appropriate under criminal forfeiture."); *United States v. Awad*, 598 F.3d 76 (2d Cir. 2009)("[C]riminal forfeiture need not be traced to identifiable assets in a defendant's possession."); *United States v. Day*, 524 F.3d 1367, 1377–78 (D.C. Cir. 2008)("Nothing in the relevant statutes suggests that money judgments are *forbidden.*"(emphasis in original)); *United States v. Padron*, 527 F.3d 1156, 1162 (11th Cir. 2008)("[T]he federal rules explicitly contemplate the entry of money judgments."); *United States v. Misla-Aldarondo,* 478 F.3d 52, 72–75 (1st Cir. 2007)("If the [G]overnment seeks, and the court grants, a money judgment as part of the forfeiture order, then 'the [G]overnment need not prove that the defendant actually has the forfeited proceeds in his possession at the time of conviction . . . [A] court may properly issue a money judgment as part of a forfeiture order, whether or not the defendant still retains the actual property involved in the offense, or any property at all.' "); *Casey*, 444 F.3d at 1074–76 ("We are satisfied that money judgments will advance the purposes of the [CFA] in combating the illegal drug trade and punishing those involved in it."); *United States v. Vampire Nation*, 451 F.3d 189, 201–02 (3d Cir. 2006) ("We observe that adopting [the defendant's] position would permit [those] who unlawfully obtain proceeds to dissipate those proceeds and avoid liability for their ill-gotten gains."); *United States v. Baker*, 227 F.3d 955, 970 (7th Cir. 2000)("The [forfeiture order] includes the income [the defendant] generated over the years, not what he now has. . . This was proper."). "We join our sister circuits and hold that money judgments are appropriate in the criminal forfeiture context." *Day*, 524 F.3d at 1378.

Additionally, we consider *United States v. Haberman*, 338 F. App'x 442, 445 (5th Cir. 2009). Though it is not precedential, we find *Haberman*

persuasive. In *Haberman*, the defendant was convicted for conspiracy to distribute and possess with intent to distribute cocaine. *Id.* at 443. This court upheld a money judgment in a similar context as not plainly erroneous. *Id.* at 445. The plain language of the CFA, alongside *Monsanto*, *Casey*, *Haberman*, together with 21 U.S.C. § 853(o)'s mandate to construe the CFA liberally, as well as a survey of our sister circuits, all undermine Olguin's argument that the CFA was not designed to reach ill-gotten monies from the conspiracy, and inform our conclusion that the district court did not commit reversible error in its imposition of a money judgment against Olguin.

### 2.

This court next considers whether each defendant was jointly and severally liable for the full proceeds of the conspiracy. Olguin argues that the Government failed to establish the required nexus between the forfeiture and Olguin's offense. Meanwhile, Ledesma resurrects his alternating-conspiracies argument as a shield to joint and several liability. He argues that he was not a member of the charged conspiracy and thus should not be liable for the money judgment. Moreover, Ledesma asserts that there was no evidence that he received any money at all. The Government contends that joint and several liability is a universally accepted principle and is part of the mandatory nature of forfeiture. Losoya and Macias make no argument on this issue.

As stated above, this court reviews the district court's legal conclusion as to the propriety of a forfeiture order de novo. *Taylor*, 582 F.3d at 565. This court reviews the district court's findings of fact under the clearly erroneous standard of review, and the question of whether those facts constitute legally proper forfeiture de novo. *Marmolejo*, 89 F.3d at 1197.

As to Olguin, we need not reach the question of whether joint and several liability applies to all defendants in all forfeiture actions under 21 U.S.C. § 853 or whether there are any limitations on forfeiture liability such as the

foreseeability doctrine or the Excessive Fines Clause. *See Alexander v. United States*, 509 U.S. 544, 558-59 (1993) (holding that in personam criminal forfeiture is subject to the Excessive Fines Clause); *United States v. Spano*, 421 F.3d 599, 603 (7th Cir. 2005) (noting a consensus that foreseeability limits forfeiture amount). At oral argument, Olguin argued that as a minor participant in the conspiracy, he should not be held liable for the entire sum received by all of his co-conspirators during the conspiracy. However, testimony established that Olguin played a part in transporting six loads of marijuana, each valued at approximately $600,000, which exceeds the $2 million forfeiture amount for which Olguin was held liable. It is not necessary, therefore, to rely on the theory of joint and several liability to affirm the forfeiture judgment as to Olguin. The statute allows forfeiture of property a defendant "obtained, directly or *indirectly*." 21 U.S.C. § 853(a)(1) (emphasis added). Contrary to Olguin's argument, this is not a case where a small player in a massive conspiracy is held liable for a grossly excessive sum or a sum far exceeding his own involvement.

With respect to Ledesma's argument, we conclude that having dismissed Ledesma's sufficiency of the evidence complaint in Section D, *supra*, we may dismiss it as a basis to shield him from forfeiture liability. In passing, Ledesma also argues that there "has to [be] evidence that the person obtained such [forfeited] proceeds" and that no such evidence was presented. Ledesma fails to cite any authority for his argument; therefore, we conclude that he has waived this issue. *See Douglas W. ex rel. Jason D.W. v. Houston Indep. Sch. Dist.*, 158 F.3d 205, 211 n.4 (5th Cir. 1998) (per curiam) ("[F]ailure to provide any legal or factual analysis of an issue on appeal waives that issue."). In any event, as discussed above with Olguin, Ledesma's analysis fails to address the fact that the statutory language is "obtained, directly or *indirectly*." 21 U.S.C. §853(a)(1)(emphasis added).

No. 09-10916

For these reasons, Olguin's inadequacy of the nexus argument and Ledesma's alternating conspiracy arguments do not overcome the deference we accord to the district court, and the precedent of this court. Thus, the district court did not commit reversible error in its application of the forfeiture statute.

**3.**

The last issue for the court's consideration with respect to the district court's forfeiture judgment is whether the district court erred in determining the forfeiture amount based on the gross, and not the net, proceeds of the conspiracy. Ledesma and Losoya argue that "proceeds" refers to profits, and not receipts. Thus, the district court erred when it computed the amount based upon the gross amount of the conspiracy yielded, and not the net profits. The Government argues that the plain language of § 853 undermines Ledesma's argument and that under the CFA, "proceeds" includes all gross receipts, not just profits of the criminal enterprise. Olguin and Macias make no argument on this issue.

As stated above, this court reviews the district court's legal conclusion as to the propriety of a forfeiture order de novo. *Taylor*, 582 F.3d at 565. This court reviews the district court's findings of fact under the clearly erroneous standard of review, and the question of whether those facts constitute legally proper forfeiture de novo. *Marmolejo*, 89 F.3d at 1197.

It bears repeating that the CFA is a broad statute. It is designed to effectuate the forfeiture of "any of the person's property use, or intended to be used, in any manner or part, to commit or to facilitate the commission of, such violation." 21 U.S.C § 853(a)(2). It is against this framework that Ledesma makes his argument.

In support of his profits-not-proceeds argument, Ledesma urges the court to consider *United States v. Santos*, 553 U.S. 507 (2008). In *Santos*, a plurality of the Supreme Court limited the term "proceed" in the federal money laundering statute to profits. *Id*. at 523. The Court held that because the term

22

was ambiguous, the rule of lenity applied, and thus forfeitures applied to profits and not receipts. *Id*. Though not dispositive, *Santos* is instructive to this court's analysis. Losoya, for his part, acknowledges that § 853 forfeiture orders have traditionally been based on gross proceeds.

Yet, neither Ledesma's nor Losoya's argument overcomes this court's decision in *United States v. Fernandez*. 559 F.3d 303 (5th Cir. 2009). In *Fernandez*, this court affirmed drug-trafficking convictions and the district court's forfeiture order characterizing proceeds as receipts, not profits. *Id*. at 312. In *Fernandez*, the court was confronted with a similar issue, as in how to handle the issue of receipts versus profits in the drug-trafficking context. In *Fernandez* we noted that despite *Santos*'s plurality opinion, we found Justice Stevens's concurring opinion in *Santos* instructive. *Id*. at 316. *Fernandez* cited Justice Stevens's concurrence for the proposition that Congress intended "proceeds" to have different meanings in different criminal contexts. *Id*. When considering the sale of contraband and the operation of a criminal organization, precisely the same conduct at issue here, this court in *Fernandez* embraced Justice Stevens's rationale, and held that the defendant in *Fernandez* could not, on appellate review, render the district court's proceeds-not-profits characterization of the forfeiture order as plainly erroneous. *Id*. Because we see many similarities between this case and *Fernandez*, we adopt our reasoning from that case here.

Moreover, there is a logical inconsistency in holding that a forfeiture order reaches only profits and not receipts in a context where narcotics are illicitly trafficked for profit. Such a holding would excuse monies spent on the cost of running the conspiracy and the enterprise. In this case, that would mean that the law turns a blind eye to the cost of renting a U-Haul, the monies spent on the communications apparatus erected to further the enterprise, and any other monies expended to fuel the conspiracy. "Congress intended criminal forfeiture provisions to eliminate profit from certain criminal activities, including . . . drug

trafficking." *Casey*, 444 F.3d at 1073.  The court in *Casey* continued, citing an "oft-quoted" passage from the Seventh Circuit in rejecting the argument that certain portions of a defendant's money would remain beyond the reach of a district court's forfeiture order:

> a [defendant] who dissipates the profits or proceeds of his [illegal] activity on wine, women and song has profited from . . . . crime to the same extent as if he had put the money in his bank account.  Every dollar that the [criminal] derives from illicit activities and then spends on such items as food, entertainment, college tuition and charity is a dollar that should not have been available for him to spend for these purposes.

*Casey*, 444 F.3d at 1074 (quoting *United States v. Ginsburg*, 773 F.2d 798, 803 (7th Cir. 1985)).  *Casey* and *Ginsburg* confirm that the CFA was intended to reach every last dollar that flowed through the criminal's hands in connection with the illicit activity.  Were we to hold otherwise, and the Appellants' arguments embraced, it would essentially mean that criminal defendants have an in-road by which to thwart Congressional intent in wanting to punish parties for their involvement in a criminal enterprise.  This is confirmed by the broad expanse of § 853 as well as our embrace of Justice Stevens's concurrence from *Santos* in *Fernandez*.  As such, this court affirms the district court's judgment that the forfeiture order apply to gross receipts, and not simply profits.

## F.

Lastly, Losoya takes exception with the district court's application of his sentence.  He argues that the district court erred in its application of two sentencing enhancements.  Losoya contends that the obstruction of justice enhancement added to his base-offense level can only be applied for conduct affecting the investigation of prosecution of the instant, and not subsequent or later offenses.  With respect to the leader/organizer enhancement, Losoya contends that his conduct met few, if any, of the factors delineated for the

No. 09-10916

application of the enhancement. The Government, meanwhile, argues that both enhancements were properly applied and the district court did not clearly err in its calculation of Losoya's sentence.

Review of a district court's interpretation of the United States Sentencing Guidelines ("Sentencing Guidelines") is de novo and review of a district court's factual findings are reviewed for clear error. *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008) (citing *United States v. Juarez-Duarte*, 513 F.3d 204 (5th Cir. 2008)). With respect to the application of a sentencing enhancement, this court must determine whether the district court's conclusion was plausible in light of the record as a whole. *United States v. Lambright*, 320 F.3d 517, 518 (5th Cir. 2003) (internal citation and quotations omitted).

**1.**

The Sentencing Guidelines provide for a two-level enhancement to the base offense level where:

> (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense.

U.S.S.G. § 3C1.1 (2009).

Losoya first claims that the district court applied this enhancement in error. He argues that even if he were to concede that the complained-of conduct were true—that he ordered retaliatory hits, or "mulettas" against those who testified for the Government—such conduct cannot be characterized as obstruction of justice because the alleged conduct sought to be sanctioned by the application of the enhancement occurred after his conviction, and thus falls outside the scope of conduct that affects the investigation, prosecution, or

25

sentencing of the instant offense. The Government argues that Losoya's argument fails because the threats and thus the obstructive conduct, occurred while his case was still pending before sentencing.

Losoya argues that his argument finds refuge in *United States v. Wilson*. 904 F.2d 234 (5th Cir. 1990). It does not. In *Wilson*, this court vacated an obstruction of justice enhancement applied to a criminal defendant for his use of an alias during the commission of a firearms offense. *Id.* at 235. That case is distinguishable. First, the defendant there never wilfully impeded or obstructed the administration of justice. *Id.* Moreover, he merely misrepresented his identity to Federal Express, instead of law enforcement personnel. Also, at the time of his misrepresentation, no prosecution had yet begun. *Id.* *Wilson* establishes that the enhancement is best applied against someone's "wilful attempt to obstruct an existing investigation, as opposed to a routine precaution any law violator might take." *Id.* at 236. It can hardly be the case that a routine law violator would order hits out against cooperating Government witnesses. Losoya's behavior fits the framework for the obstruction of justice sentencing enhancement.

As the Sentencing Guidelines make clear, the obstructive conduct can occur at any time in the proceedings, including prior to sentencing. U.S.S.G. § 3B1.1, cmt. n.4(i); 8 U.S.C. § 1513. Losoya's argument that he waited to order harm on witnesses until after they cooperated with the Government's investigation and that this delay somehow excuses him from the repercussions of his obstructive behavior frankly strikes the court as hollow. Thus, we leave undisturbed the district court's obstruction of justice enhancement.

**2.**

The Guidelines also prescribe a four-level increase in the base offense level where a defendant was an organizer or leader of an enterprise involving five or

more participants.  U.S.S.G. § 3B1.1(a).  Factors courts consider in making this determination include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature of the illegal activity, and the degree of control over others.

U.S.S.G. § 3B1.1, cmt. n.4.

Losoya argues that the district court erred in its application of the leader/organizer sentencing enhancement.  Losoya's argument on these grounds, too, fails.  First, as our precedent makes clear, a sentencing enhancement is applicable if the defendant is *a* leader and not *the* leader.  The article before the noun is not insignificant.  *See generally United States v. Pecina-Ramirez*, 360 F. App'x 567, 568 (5th Cir. 2010).

Losoya argues that he was hardly a leader.  He claims that his role was limited to ensuring attendance and enrolling new members.  He argues that his insignificant role is demonstrated by the fact that he had no control over the members of the gang syndicate either with respect to their narcotics trafficking operation, or in the members' cooperation with the Government.  Of all of Section 3B1.1 n.4's factors, he claims the only factors that counsel in favor of the enhancement were the third and sixth: recruitment of accomplices and nature and scope of the illegal activity.  The Government argues that under the clear error standard, the leader/organizer enhancement should not be reversed.  We agree with the Government.

The district court's enhancement was based on the defendant's PSR. Losoya directed the criminal conduct of the syndicate's members and non-members alike. The PSR notes that Losoya directed the actions of at least three

27

co-conspirators and ordered others to retrieve money from one member, presumably either for the sake of profiting from the conspiracy or in furtherance of it. As we have previously held, "a district court is allowed to rely on information contained in the PSR in making factual sentencing determinations so long as the information has some minimum indicium of reliability." *United States v. Shipley*, 963 F.2d 56, 59 (5th Cir. 1992) (internal citations and quotation marks omitted). This conclusion is buttressed by the fact that Losoya concedes two of Section 3B1.1 n.4's factors. As indicated earlier, the Government merely alleged Losoya to be a leader, not the leader. Because decisions in furtherance of the criminal conduct are made by those who show up, and Losoya admitted to, *inter alia*, the recruitment of accomplices, we hold that this alone suffices for the sentencing enhancement to apply.

In any event, it was Losoya's burden to rebut the PSR's assertions with evidence, which he did not do. In light of the record as a whole, the district court's conclusion that Losoya was a leader in the enterprise was plausible, and the sentencing enhancement not in error.

**III.**

A review of the record, as well as an examination of the briefs, reveals that the Appellants did conspire to possess and traffic controlled substances. The evidence yields proof of the transaction's cessation only when law enforcement personnel interrupted the sale at the Berry Lot. In light of the deference this court's standards of review afford a district court in the administration of the trial, the arguments presented by the defendants do not compel reversal on any of the issues discussed above. As such, this court will AFFIRM the judgment of the district court in all respects, for the reasons discussed above.