# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 17, 2013

Lyle W. Cayce
Clerk

No. 12-30413

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

RAMON TERRELL DANIELS; JECARLOS MONTRAE CARTER; TENISHA
DESHEA CARTER; ANTONIO DEMETRIOUS FURLOW; GRANSIHI DEON
MIMS, also known as Granshi; AUBURN THOMAS, also known as Big,

Defendants-Appellants

Appeals from the United States District Court
for the Western District of Louisiana

Before KING, DAVIS, and ELROD, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Defendants Ramon Daniels, JeCarlos Carter, Tenisha Carter, Antonio
Furlow, Gransihi Mims, and Auburn Thomas appeal their convictions and
sentences for conspiracy to distribute and to possess with intent to distribute five
kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and
(b)(1)(A)(ii). Defendants argue that the evidence at trial was insufficient to
support the jury's verdict that the conspiracy involved five kilograms or more of
cocaine. We find that there is insufficient evidence to support the finding that

No. 12-30413

defendants conspired to distribute more than five kilograms of cocaine. But, because drug quantity is not an essential element of a conspiracy offense we reverse only as to the drug quantity finding, as there was sufficient evidence to support the conspiracy conviction. We are unpersuaded by defendants' other claims of error. Thus we AFFIRM in part, and VACATE and REMAND in part with instructions to resentence defendants for conspiracy to distribute cocaine under 21 U.S.C. § 841(b)(1)(B)(ii).

## I. FACTS AND PROCEEDINGS

In late summer 2009, the FBI began an investigation of an illegal drug trafficking organization that obtained cocaine in Dallas, Texas, and distributed it in Shreveport, Louisiana, and the surrounding area. A confidential informant (CI) came forward and informed law enforcement that he could purchase cocaine from Lionel Pugh, who received cocaine from JeCarlos Carter, a resident of Dallas and the leader of the organization. From October 2009 to July 2010, the CI regularly made controlled purchases of cocaine from Pugh.

Officers continued to monitor Pugh. In February 2010, they installed a pole camera to view Pugh's home and activities around his home. Officers also began to maintain regular surveillance in teams to follow the individuals observed at Pugh's residence. Surveillance teams followed many of these individuals to locations other than Pugh's residence. Investigating officers also obtained a Title III wiretap on Pugh's cell phone.

Officers expanded their investigation beyond Pugh as it became apparent that Pugh was giving more information to the CI regarding his sources of cocaine. With the information officers acquired, they applied for a wiretap on JeCarlos's cell phone.[1] Officials later obtained a wiretap on a second cell phone belonging to JeCarlos. With the aid of the information that Pugh provided to the

---

[1] Because defendants JeCarlos Carter and Tenisha Carter have a common surname, once introduced, we refer to these defendants by their first names to avoid confusion.

2

CI, and through the use of the various wiretaps and the pole camera, officers were able to conduct detailed surveillance of the defendants' drug trafficking activities in Dallas and Shreveport and were able to determine approximately when Pugh would be obtaining cocaine.

Over the course of the investigation, officers learned about the general structure of the organization and the roles the various members played. JeCarlos resided in Dallas and obtained quantities of cocaine in Dallas from an individual named Thomas Mejorado. Upon receiving cocaine from Mejorado, JeCarlos utilized the services of Auburn Thomas, a Dallas resident, who would drive from Dallas to the Shreveport area to deliver the cocaine on behalf of JeCarlos. Thomas would deliver cocaine to Pugh, to defendants Antonio Furlow and Gransihi Mims, and to others, including Rodney Theus, Christopher Larry, and an individual called "Seebo." The investigation revealed that Furlow and Mims coordinated drug deals with JeCarlos, and distributed cocaine that JeCarlos sent to Shreveport with Thomas. Officers also learned that defendant Tenisha Carter, JeCarlos's sister, resided with Furlow and would store and distribute cocaine on behalf of JeCarlos. The investigation further revealed that defendant Ramon Daniels, a friend of JeCarlos, was involved in the organization. Officers recorded cell phone conversations between JeCarlos and Daniels relating to drug deals, and they identified Daniels accompanying JeCarlos during various transactions involving cocaine.

On July 18, 2010, the Government observed Thomas arriving at Pugh's residence and saw Pugh retrieve a bundle from Thomas's car. Pugh left his home, and officers stopped him, read him his *Miranda* rights, and offered him an opportunity to cooperate in their investigation. Pugh accepted the offer to cooperate and consented to a search of his home. This search resulted in the seizure of approximately three-quarters of a kilogram of cocaine. Later, the Government monitored calls between JeCarlos and Pugh that confirmed that

No. 12-30413

Thomas had delivered this cocaine on behalf of JeCarlos. During these calls JeCarlos arranged to meet with Pugh to pick up the money for the cocaine.

On July 20, 2010, Pugh and JeCarlos met in a Home Depot parking lot. The Government provided Pugh with $22,000 in a bag to give to JeCarlos as payment for the cocaine. Immediately after Pugh placed the bag of drug money in JeCarlos's car, federal agents arrived at the scene. The agents detained the occupants of the car: JeCarlos, his adolescent son, and Daniels. After JeCarlos indicated that he would not cooperate with the investigation into Mejorado's drug distribution scheme in Dallas, the agents arrested JeCarlos and Daniels.

In March 2011, the grand jury returned a superceding indictment charging each of the defendants with conspiracy to distribute and to possess with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of powder cocaine in violation of 21 U.S.C. §§ 841(a)(1),[2] (b)(1)(A)(ii),[3] and 846[4] (Count 1). In the superceding indictment, certain members

---

[2] 21 U.S.C. § 841(a)(1) provides:

(a) Unlawful acts
[I]t shall be unlawful for any person knowingly or intentionally—
> (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . .

[3] 21 U.S.C. § 841(b)(1)(A)(ii) provides, in relevant part:

(b) Penalties
[A]ny person who violates subsection (a) of this section shall be sentenced as follows:
> (1)(A) In the case of a violation of subsection (a) of this section involving—
>> . . . .
>> (ii) 5 kilograms or more of a mixture or substance containing a detectable amount of—
>>> . . . .
>>> (II) cocaine, its salts, optical and geometric isomers, and salts of isomers;
>>> . . . .
> such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life and if death or serious bodily injury results from the use of such substance shall be not less than 20

4

No. 12-30413

of the conspiracy were charged with substantive counts of possession with intent to distribute powder cocaine on various dates under 21 U.S.C. § 841(a)(1), and (b)(1)(B)(ii)[5] or (b)(1)(C)[6] (Counts 2-4, 6, 7, and 10)[7]; other conspirators were

_____

years or more than life . . . . If any person commits such a violation after a prior conviction for a felony drug offense has become final, such a person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment . . . . If any person commits a violation of this subparagraph . . . after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release and fined in accordance with the preceding sentence.

[4] 21 U.S.C. § 846 provides:

Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

[5] 21 U.S.C. § 841(b)(1)(B)(ii) provides:

(b) Penalties
[A]ny person who violates subsection (a) of this section shall be sentenced as follows:
. . . .
(1)(B) In the case of a violation of subsection (a) of this section involving—
. . . .
(ii) 500 grams or more of a mixture or substance containing a detectable amount of—
(II) cocaine, its salts, optical and geometric isomers, and salts of isomers;
. . . .
such person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years and if death or serious bodily injury results from the use of such substance shall be not less than 20 years or more than life . . . . If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 10 years and not more than life imprisonment and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment . . . .

[6] 21 U.S.C. § 841(b)(1)(C) provides:

In the case of a controlled substance in schedule I or II, . . . except as provided

5

No. 12-30413

charged with the unlawful use of a communication facility in violation of 21 U.S.C. § 843(b) (Counts 5, 8, and 9).[8]

All six defendants proceeded to trial by a jury. At trial, the Government presented various types of audio and visual evidence of the charged offenses, including photographs of alleged drug deals that occurred on multiple dates between certain defendants; recordings of phone conversations pertaining to cocaine deals between various defendants, and between defendants and Pugh; and text messages sent between the defendants regarding cocaine distribution. Various Government witnesses testified, including the law enforcement officers who engaged in surveillance of defendants in Dallas and the Shreveport area; officers who prepared and supervised the preparation of the wire transcripts; the

---

in subparagraphs (A), (B), and (D), such person shall be sentenced to a term of imprisonment of not more than 20 years and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than twenty years or more than life . . . . If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 30 years and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment . . . .

[7] While the indictment correctly describes all of the charges under each of the Counts, it appears to erroneously list Counts 7 and 10 as violating § 841(b)(1)(C) when in fact the conduct described is possession with intent to distribute 500 grams or more of cocaine such that the listed charge should be § 841(b)(1)(B)(ii); and erroneously lists Count 6 as violating § 841(b)(1)(B)(ii) when in fact the conduct described is possession with intent to distribute a detectable amount of cocaine such that the listed charge should be § 841(b)(1)(C).

[8] 21 U.S.C. § 843(b) provides:

(b) Communication facility

It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter. Each separate use of a communication facility shall be a separate offense under this subsection. For purposes of this subsection, the term "communication facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication.

6

No. 12-30413

chemists who analyzed the narcotics obtained throughout the investigation; and Pugh, who offered context for various photographs and wire intercepts, and explained the involvement of certain defendants in the conspiracy. Agent Russell Sarpy also testified about the meaning of various terms typically used in drug trafficking organizations.

The jury heard testimony about twelve controlled purchases of cocaine in which the CI bought varying quantities of cocaine from Pugh between October 2009 and July 2010—for a total quantity of 750.8 grams—and the Government introduced this seized cocaine into evidence. The jury further heard that the Government seized 784.5 grams of cocaine from Pugh's residence on July 18, 2010, and the Government entered this quantity of cocaine into evidence.[9] Thus, in total, the Government physically seized, and introduced in evidence before the jury, 1.535 kilograms of cocaine.

At the end of the Government's case, each defendant made a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, which was denied. JeCarlos, Furlow, and Mims then presented their cases. Thomas, Daniels, and Tenisha did not present cases. At the close of evidence, only Furlow renewed his Rule 29 motion. At the conclusion of the eight day trial, the jury found the defendants guilty of all the offenses with which they were charged in the superceding indictment.

Prior to sentencing, the district court conducted a hearing on drug quantity in which all defendants participated. At the hearing, the district court noted that the jury had found all of the defendants guilty of conspiring to distribute five kilograms or more of cocaine. Believing that not making a drug quantity finding as to each defendant could lead to problems on appeal, or could cause future complications depending on potential revisions to the sentencing

---

[9] Government Exhibit 215-001 is a chart itemizing the various dates and quantities of cocaine purchased or seized from Pugh.

guidelines, the defendants, led by Thomas, urged the court to make such findings. The defendants also acknowledged that the five kilogram amount was found by the jury beyond a reasonable doubt, and was a floor for sentencing purposes. In response to the defendants' concern regarding drug quantity, the Government agreed to stipulate that the offenses involved five kilograms of cocaine. All defendants agreed to stipulate to this amount for the limited purpose of sentencing. Each defendant also reserved his or her right to argue sufficiency of the evidence on appeal with respect to the quantity of cocaine proved at trial.

All defendants except Thomas had prior felony drug convictions, which mandated enhanced mandatory minimum sentences. Based upon the stipulated quantity of cocaine and the criminal history backgrounds of the defendants, the district court sentenced the defendants as follows.

JeCarlos had two prior drug convictions, and was sentenced to a mandatory term of life as to Count 1, to 360 months as to Counts 2, 4, 6, 7, and 10, and to 96 months as to Counts 5, 8, and 9, all sentences to run concurrently.

Mims's guideline range was 151 to 188 months. Because he had one prior felony drug conviction, the district court imposed the mandatory minimum sentence of 240 months imprisonment on Count 1 and imposed 240 months of imprisonment on Count 6, running concurrently.

Furlow's guideline range was 151 to 188 months. Because he had one prior felony drug conviction, the district court imposed the mandatory minimum sentence of 240 months imprisonment on Counts 1 and imposed 240 months imprisonment on Count 3, running concurrently.

Daniels's guideline range was 168 to 210 months. Because he had one prior felony drug conviction, the district court imposed the mandatory minimum

No. 12-30413

sentence of 240 months imprisonment on Count 1 and imposed 240 months imprisonment on Count 8, running concurrently.[10]

Tenisha's guideline range was 151 to 188 months. Because she had one prior felony drug conviction, the district court imposed the mandatory minimum sentence of 240 months imprisonment on Count 1 and imposed 60 months on Counts 5 and 9, all sentences running concurrently.

Thomas's guideline range was 135 to 168 months. With no prior felony drug conviction, the district court sentenced him to 150 months as to Counts 1, 2, 4, 6, 7, and 10, all sentences running concurrently.

Defendants filed no written motions for new trial or for judgment of acquittal. All of the defendants timely appealed.

## II. DISCUSSION

On appeal, we consider the following questions: whether the evidence presented at trial was sufficient to sustain the conviction of each defendant on the conspiracy count, and to sustain defendants' convictions on certain substantive counts; and whether the district court abused its discretion in admitting business records despite the Government's failure to give written

---

[10] While Daniels does not address this in his brief, Count 8 charged Daniels with Unlawful Use of a Communication Facility under 21 U.S.C. § 843(b). Under this provision, a violator with a previous drug felony, such as Daniels, "shall be sentenced to a term of imprisonment of not more than 8 years." 21 U.S.C. § 843(d)(1). Indeed, Daniels's Presentence Investigation Report reflects that the "statutory term of imprisonment for [Count 8] is not more than eight (8) years." Because the superseding indictment confusingly listed 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) under Count 8, and because the district court then cited 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) on Daniels's judgment, this may have been the source of the sentencing error which led to the erroneous imposition of 240 months on this Count. Regardless, the imposition of 240 months imprisonment on Count 8 is plain error. We remand for resentencing on this Count.

notice of the attestations for these records before trial.[11] We address these questions in turn

## A.    Sufficiency of the Evidence

### 1.    Standard of Review

All of the defendants moved for acquittal under Rule 29 of the Federal Rules of Criminal Procedure at the close of the Government's case, which the district court denied.

After JeCarlos, Mims, and Furlow offered evidence in support of their respective defenses, only Furlow renewed his motion for judgment of acquittal. Because Furlow renewed his Rule 29 motion after presenting evidence, we review the denial of his motion *de novo. See United States v. Xu*, 599 F.3d 452, 453 (5th Cir. 2010). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The Government argues that those defendants who did not renew their Rule 29 motions failed to preserve their challenges to the sufficiency of the evidence for appellate review.[12] The Government argues that our review of their challenges to the sufficiency of the evidence is therefore "limited to determining whether there was a manifest miscarriage of justice, that is, whether the record

---

[11] Because we remand for resentencing, we need not address defendants' further arguments related to sentencing, i.e., whether the sentences for defendants Furlow, Mims, and Tenisha should not have been based on five kilograms, but instead on the amount that each possessed or distributed; and whether the use of Daniels's prior conviction to enhance his sentence under § 841(b) violates the Fifth and Sixth Amendments because he has not admitted the prior conviction and because those convictions have not been proven to a jury.

[12] *See United States v. Delgado*, 256 F.3d 264, 274 (5th Cir. 2001) (stating that failure to renew a motion for acquittal after the presentation of defense evidence, or alternatively at the close of all evidence, results in waiver of an objection to an earlier denial of a Rule 29 motion).

No. 12-30413

is 'devoid of evidence pointing to guilt.'" *Delgado*, 256 F.3d at 274 (quoting *United States v. Daniel*, 957 F.2d 162, 164 (5th Cir. 1992)).

We reject the Government's argument that the other defendants' challenges to the sufficiency of the evidence should be reviewed only for manifest miscarriage of justice for two reasons. First, Thomas, Daniels, and Tenisha did not need to renew their Rule 29 motions in order to preserve their challenges because they did not present evidence.[13] Thus, we review their challenges *de novo*. And second, all defendants agreed at the outset of trial that any objection made by one defendant would be considered an objection made by all.[14] Although this agreement technically concerned evidentiary objections, confusion surrounding its application may have been compounded by the district court's describing Furlow's renewal of his Rule 29 motion as unnecessary:

> MR. LEE HARVILLE [Furlow's Attorney]: Your Honor, as an appellate lawyer, I would like to renew my motion for judgment of acquittal. I don't know that we need to, but if I could renew that?
>
> THE COURT: You don't, but you're welcome to.

---

[13] *See United States v. Arias-Dias*, 497 F.2d 165, 168-69 (5th Cir. 1974) (finding that a defendant who does not present a case is not required to renew his motion for acquittal at the close of all evidence to preserve his claims for review).

[14] On the first morning of trial, the district court engaged in the following discussion with defense counsel:

> MR. LEE HARVILLE [Furlow's Attorney]: Your Honor, Defense Counsel and I have discussed this, and I think to preserve Your Honor's time, I would ask that Your Honor take the objections from each counsel as objections for all counsel. I know we discussed that before, but we just need that on the record for this trial.
>
> THE COURT: And that's one of the other things, for housekeeping, we need to determine—whether it's a Musketeers objection kind of thing or whether it's singular to one client or another. Is the sense of the assembly that any objection made by one should be considered an objection made by all?
>
> MR. LEE HARVILLE: Yes, Your Honor.
>
> . . . .
>
> THE COURT: All right.

11

No. 12-30413

MR. LEE HARVILLE: I've heard of trial lawyers who don't do such a thing, but not wanting to fall into that trap—

THE COURT: Perfectly okay. For the same reasons, denied.

In view of the district court's rule concerning objections, its comment that Furlow did not need to renew his Rule 29 motion may have caused defendants to believe that they were not required to renew their motions to preserve their claims. Given such confusion, it would be inequitable to impose a heightened standard of review on the sufficiency challenges brought by JeCarlos and Mims because the defendants may have been led to believe that they were not required to renew their Rule 29 motions after Furlow renewed his motion. Accordingly, we review the challenges to the sufficiency of the evidence brought by all of the defendants *de novo*, under the *Jackson* standard.

2.    *Conspiracy—Count 1*

All defendants argue that the evidence was insufficient to establish that they entered into a conspiracy to possess with intent to distribute five or more kilograms of powder cocaine (Count 1). To prove conspiracy under 21 U.S.C. § 846, the government must establish that: "(1) an agreement existed between two or more persons to violate federal narcotics law, (2) the defendant knew of the existence of the agreement, and (3) the defendant voluntarily participated in the conspiracy." *United States v. Ochoa*, 667 F.3d 643, 648 (5th Cir. 2012).

However, "if the government seeks enhanced penalties based on the amount of drugs under 21 U.S.C. § 841(b)(1)(A) or (B), the [drug] quantity must be stated in the indictment and submitted to the [fact finder] for a finding of proof beyond a reasonable doubt." *United States v. Doggett*, 230 F.3d 160, 164-65 (5th Cir. 2000). In the instant case, the Government sought enhanced penalties on the conspiracy charge under § 841(b)(1)(A)(ii). In accordance with *Doggett*, the indictment alleged that the conspiracy involved at least five kilograms of cocaine. If an indictment alleges involvement in a conspiracy to distribute an

12

No. 12-30413

amount of a controlled substance that triggers enhanced penalties under §§ 841(b)(1)(A) or (B), then *Apprendi v. New Jersey*, 530 U.S. 466 (2000), requires the Government to prove beyond a reasonable doubt the quantity of the alleged drug as a fourth element of the offense. *See United States v. Turner*, 319 F.3d 716, 721 (5th Cir. 2003).[15] In the case before us, the jury was instructed that it was required to find beyond a reasonable doubt that the scope of the conspiracy involved five kilograms or more of cocaine in order to convict the defendants on Count 1, and the jury so found.

a. Furlow, Thomas, Tenisha, JeCarlos, and Mims's Challenge to the Conspiracy Count

Defendants Furlow, Thomas, Tenisha, JeCarlos, and Mims all argue that the verdict that the conspiracy involved five kilograms or more of powder cocaine was not supported by sufficient evidence. The thrust of defendants' argument is that the Government's evidence recovered far less than 5 kilograms of cocaine (having actually seized only 1.535 kilograms) and that the Government's request that the jury infer that the conspiracy involved 5 kilograms was unsupported by the evidence.

We agree that the evidence presented to the jury did not support a finding that the conspiracy involved five kilograms. While a conspiracy conviction is supported by mere proof of an agreement involving drugs, and does not require actual possession and seizure of the drugs, the Government must still prove the quantity of drugs involved in the conspiracy. *See United States v. Turner*, 319 F.3d 716, 723-24 (5th Cir. 2003).

The Government argued to the jury that the cocaine purchased and seized

---

[15] *See also Alleyne v. United States*, No. 11-9335, slip op. at 7, 12 (U.S. June 17, 2013) ("Facts that increase the mandatory minimum sentence are therefore elements and must be submitted to the jury and found beyond a reasonable doubt."); ("[T]he core crime and the fact triggering the mandatory minimum sentence together constitute a new, aggravated crime, each element of which must be submitted to the jury.").

was just "the tip of the iceberg" and that even though the Government only physically seized 1.535 kilograms of cocaine from Pugh, sellers other than Pugh were involved in the conspiracy, and the jury could infer that there were many other undocumented purchases throughout the life of the conspiracy.

The Government made twelve controlled purchases of cocaine from Pugh between October of 2009 and July of 2010. In order to reach the threshold of five kilograms, the Government asked the jury to infer that, taking the ten most recent controlled purchases from Pugh: "[D]o a little bit of math. If you only consider the deliveries which correspond to the ten purchases, for assuming purposes here, that would be half a kilogram a delivery." Thus, the Government told the jury that it should assume that each controlled purchase bought from Pugh was preceded by a delivery of half a kilogram of cocaine to Pugh and other sellers involved in the conspiracy. Such an assumption of half a kilogram a delivery preceding each sale of a controlled purchase is not confirmed by the record. It is not clear that each of these ten controlled purchases was immediately preceded by a separate delivery of cocaine. Furthermore, in many instances, Pugh testified that he was unsure about the total quantity of cocaine he received. Thus, the only evidence as to any quantity of cocaine obtained on several of these dates is the purchase made by the CI—and often times the CI bought quantities as small as one or two ounces per purchase.[16] While there is evidence that there were sellers other than Pugh (including co-defendants Mims, Furlow, and Tenisha) and there were buyers other than the CI, without more evidence as to the quantity of these other sales, we are not persuaded that this

---

[16] As depicted by Government Exhibit 215-001, the controlled purchases of cocaine obtained from Pugh were as follows: 10/19/09—1 ounce crack(28.7 grams); 12/05/10—1 ounce crack (28.8 grams); 1/24/10—1 ounce crack (29.5 grams); 2/10/10—3 ounces crack (80.0 grams); 2/12/10— 1 ounce crack (29.5 grams); 2/27/10—2 ounces crack (54.1 grams); 3/06/10—2 ounces crack (58.3 grams); 3/14/10—2 ounces crack (57.1 grams); 4/03/10—2 ounces crack (56.8 grams); 5/06/10—2 ounces crack (59.4 grams); 5/19/10—1.5 ounces crack (42.8 grams); 7/13/10—9 ounces powder (225.8 grams).

supports an inference of "half a kilogram a delivery" to infer a total of five kilograms.

Additionally, the Government alleges that "kilogram quantities of cocaine were acquired by JeCarlos from Mejorado and . . . those same kilograms were delivered by Thomas to various other persons, not only to Pugh, in the Shreveport area on at least a monthly basis for the life of the conspiracy." Yet there is record evidence that JeCarlos had purchasers in Texas independent of the Shreveport operation. And there is nothing in the record that supports the conclusion that Thomas delivered full kilogram quantities of cocaine to Shreveport for JeCarlos. Furthermore, while the Government points to at least six instances where JeCarlos and Mejorado met (or at least had phone conversations suggesting planned meetings), the record is devoid of confirmation of the actual quantity obtained from many of these meetings. Thus, the only evidence the Government cites to surmise the quantity of the cocaine obtained are cryptic, vague phone calls between JeCarlos and Mejorado; in many instances there is no credible evidence to verify a transfer of drugs following each telephone conversation or the actual amount transferred.[17]

---

[17] The Government's Supplemental Brief argues that JeCarlos's acquisitions of cocaine from Mejorado total six kilograms and suggests that each time JeCarlos and Mejorado met a kilogram of cocaine was exchanged. We are not so persuaded. For example, the Government suggests that JeCarlos obtained two kilograms of cocaine (one on June 5 and one on July 1) from Mejorado based in large part on JeCarlos's conversation with Thomas in which he states, "I'm just waiting on my boy to call back and I'll have that uh, other one." And in a conversation JeCarlos has with an Unknown Male JeCarlos states "he just came through. It was, it was uh, what we always get," and the Unknown Male states: "I got a [guy] want a, want a, want a wheel. You want to see a wheel off the deal too? . . . That's twelve dollars, a whole one, two hot boys cuz." We are not convinced that these references alone support the conclusion that Mejorado delivered two kilograms to JeCarlos.

There is a conversation between JeCarlos and Mejorado on July 5 in which JeCarlos indicates he is "about a dub"—a term which, in this context, Officer Sarpy testified means $20,000 in cash and refers to a kilogram quantity of cocaine. However, even so, we are not convinced that the jury could infer beyond a reasonable doubt that each time JeCarlos and Mejorado met they always transacted in kilogram quantities.

No. 12-30413

In light of the above, we are not persuaded that the Government proved a conspiracy involving at least five kilograms of cocaine beyond a reasonable doubt.

Although we conclude that the Government did not prove a quantity of five kilograms beyond a reasonable doubt, our inquiry does not end here; for the Government's failure to prove the five kilogram quantity does not undermine the conviction. Rather, it only affects the sentence. *United States v. Rolon-Ramos*, 502 F.3d 750, 754-55 (8th Cir. 2007) (finding that defendant's conviction for conspiracy to distribute methamphetamine was not invalidated by the court's conclusion that the evidence did not support the drug quantity determination); *see also United States v. Gomez-Rosario*, 418 F.3d 90, 104 (1st Cir. 2005) ("No specific drug quantity needs to be proven for a jury to convict a defendant of conspiracy to possess with intent to distribute."). Thus, the "quantity and type" element is not necessary for a § 841(b) conviction, but is relevant only to determine the provision of § 841(b) under which defendants may be sentenced.

Other circuits have explained why the failure to prove drug quantity or type does not undermine a defendant's conviction. In *United States v. Toliver*, the Ninth Circuit distinguished the formal "elements" of offenses under § 841(a)(1) and § 846 from drug quantity and type, which it described as a "functional equivalent of an element" for *Apprendi* purposes. 351 F.3d 423, 430-31 (9th Cir. 2003), *abrogated on other grounds by Blakely v. Washington*, 542 U.S. 296 (2004). In *Toliver*, although the government "included drug quantity and type allegations in Count One . . . [yet] failed to prove any of the specific drug quantities or that cocaine base/crack was involved in the conspiracy," the Ninth Circuit held that "the defendants were not entitled to a judgment of acquittal" because the "quantity and type" element was not a formal offense element. *Id.* at 431. Rather, as a consequence of failing to prove the drug

quantity and type, "the district court was restricted in the maximum sentence that it could impose." *Id.*

The Fourth Circuit has followed the same analysis, upholding a conviction for conspiracy to violate § 841(a) but overturning the defendant's sentence due to improper determination of drug quantity. *United States v. Collins*, 415 F.3d 304 (4th Cir. 2005). In *Collins*, the Fourth Circuit determined that the district court had failed to issue "appropriate jury instructions concerning the facts necessary to determine [the defendant's] sentence." *Id.* at 314. However, it found that "[g]uilt of the substantive offense defined in § 841(a) is not dependent upon a determination of the amount or type of narcotics distributed" and that the defendant's conviction was sound. *Id.* Therefore "remanding for a new trial [was] not the appropriate remedy." *Id; see also United States v. Kelly*, 519 F.3d 355, 363 (7th Cir. 2008) ("[T]he remedy for a failure of proof that a defendant possessed a particular amount or type of cocaine would not be to grant him a judgment of acquittal or a new trial, but rather to remand for re-sentencing . . . .").

Though we have not expressly stated the principle that failure to prove drug quantity or type does not undermine a conviction under § 841(a)(1) and § 846, our holding in *United States v. Hayes* reflects the view on "functional equivalents" espoused by our sister circuits. 342 F.3d 385 (5th Cir. 2003). The defendant in *Hayes* was indicted for and convicted of conspiracy to distribute more than fifty grams of crack cocaine in violation of §§ 841(a)(1) and 846. *Id.* at 386-87. The defendant sought to have his conviction vacated because the Government offered insufficient evidence as to drug quantity. *Id.* at 391. Although we found that the evidence did not support a finding of fifty grams of crack involved in the conspiracy, our remedy was to vacate the conviction and to remand for resentencing pursuant to § 841(b)(1)(B) for conspiracy to distribute more than five and less than fifty grams of crack cocaine. *Id.* at 391-92. Clearly

the basic conspiracy conviction remained intact. If alleging a specific drug quantity in an indictment created a fourth, formal element of the conspiracy offense alleged in *Hayes*, then the Government's failure to prove the quantity alleged would have required us to vacate the defendant's conviction on the relevant counts in toto. By remanding for resentencing, we tacitly acknowledged that the insufficiency of the evidence as to quantity was not fatal to the conviction.

Thus, where a defendant may be subject to enhanced statutory penalties because of drug quantity or type, the requisite fourth "element" under *Apprendi* is not a formal element of the conspiracy offense. Hence, defendants' challenges to the quantity of cocaine charged in Count 1 of the indictment does not go to the validity of their convictions, but rather to the sentence that the district court may impose.

Although in *Hayes* and *Toliver* the jury was asked to first find whether a conspiracy had been established and then presented with a special verdict form to choose the quantity of cocaine involved in the conspiracy, we do not find that submission to the jury in this form is required, although it may well be preferable.[18] It follows that neither the inclusion of "That the quantity of the substance was at least 5 kilograms or more" in the indictment and jury instruction, nor the failure to use a special verdict form undermines our conclusion that *Hayes* and *Toliver* control our decision on this issue.

In sum, although the Government did not prove the five kilogram quantity alleged, this failure does not invalidate defendants' conspiracy convictions; rather, it only affects the sentence. We are mindful of the Supreme Court's

---

[18] *See* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) 2.89 note (2012) ("If there is a fact dispute . . . as to whether the amount is above or below a particular baseline . . . the court may substitute for the fourth element a special interrogatory asking the jury to indicate the total amount of the controlled substance it believes was proved beyond a reasonable doubt.").

No. 12-30413

recent clarification in *Alleyne v. United States* that "[w]hen a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury." No. 11-9335, slip op. at 14 (U.S. June 17, 2013). Here the five kilogram quantity of cocaine, which would have aggravated the punishment, was submitted to and found by the jury. As discussed above, we found the evidence insufficient to support the five kilogram finding. In remanding for resentencing under § 841(b)(1)(B)(ii), we acknowledge that the way the verdict form was structured, the jury did not have an opportunity to make an *explicit* finding that 500 grams or more of cocaine were involved in the conspiracy. Even so, we are confident that the jury's finding that 5 kilograms of cocaine were involved also encompassed a jury finding that the lesser quantity of 500 grams or more was involved. Thus resentencing under § 841(b)(1)(B)(ii) is appropriate.

Finally, the Government argues that the defendants' stipulation that five kilograms were involved for sentencing purposes should bind them on the sufficiency question as well. We disagree. Defendants made clear that the stipulation was for sentencing purposes only. The district court noted that "all defendants reserved the right to contest the drug quantity as part of any appeal on a sufficiency of evidence basis." We therefore decline to hold all defendants to a five kilogram stipulation for any purpose other than sentencing.

Although the Government's failure to prove the five kilogram quantity will require resentencing, we reject defendants' argument that this failure will require vacating their convictions.

b.     Daniels's Challenge to the Conspiracy Count

Daniels asserts a different challenge to the sufficiency of the evidence supporting his conspiracy conviction. He argues that the Government provided

19

no evidence that he had *any* connection to the powder cocaine conspiracy with which the other defendants were involved. We disagree. The Government offered the following evidence to support Daniels's conviction on the conspiracy count:

(i) in a series of calls with JeCarlos on July 13, 2010, Daniels discussed the quality of cocaine he acquired from Mims;

(ii) in that same series of calls, JeCarlos told Daniels to retrieve the payment for some of the drugs retrieved, and Daniels informed JeCarlos that he still had possession of the drugs, which have been cooked from cocaine into crack;

(iii) Pugh testified that he gave Daniels a ride to the Greyhound Bus station in Shreveport so that Daniels could bring cocaine money to JeCarlos in Dallas;

(iv) the Government presented evidence of telephone communications between JeCarlos and Daniels in which JeCarlos told Daniels that he needs to grab some "paperwork," a code word for "drug money";

(v) Pugh testified that Daniels was with JeCarlos on multiple occasions when JeCarlos engaged in drug-related transactions with Pugh, including on May 6, May 8, May 18, and July 2, as well as on July 20, 2010, when Daniels and JeCarlos were both arrested in a Home Depot parking lot.

The Government did not have to show that Daniels entered into an express agreement to engage in the conspiracy alleged in Count 1: "[A] tacit, mutual agreement with common purpose, design, and understanding will suffice." *United States v. Zamora*, 661 F.3d 200, 209 (5th Cir. 2011) (internal quotation marks and citation omitted). Further, a defendant may be convicted of a conspiracy even if he only played a minor role in the conspiracy; and a defendant need not know all of the specific details of the conspiracy, need not know all of the other conspirators, and need not have ever physically touched any of the drugs involved in the conspiracy. *See United States v. Posada-Rios*, 158 F.3d 832,

858 (5th Cir. 1998).[19]  And even though "[t]he Government need not prove an overt act to show participation in a conspiracy," *Turner*, 319 F.3d at 721, it provided evidence that Daniels delivered drug money to JeCarlos and that Daniels had acquired cocaine from Mims.

Viewing the evidence in the light most favorable to the prosecution, and drawing all reasonable inferences in favor of the verdict, we hold that a rational juror could have found Daniels guilty of conspiracy under § 846 beyond a reasonable doubt.

### 3.    *Daniels—Count 8*

Daniels challenges the sufficiency of evidence to support his conviction on Count 8 for the unlawful use of a communication facility—specifically, a cell phone—in facilitating the conspiracy alleged in Count 1, in violation of § 843(b). Under § 843(b), the Government was required to prove that the defendant knowingly or intentionally used a communication facility to facilitate commission of a drug offense. *United States v. Mankins*, 135 F.3d 946, 949 (5th Cir. 1998). Daniels was convicted on this count for use of a cell phone in furtherance of the conspiracy on the evening of July 13, 2010. As discussed above, the Government presented recordings of a series of calls between Daniels and JeCarlos at trial. In the intercepts, Daniels and JeCarlos discussed, on their cell phones, drug deals involving co-defendant Mims and an individual named "White," and they referenced drug quantity (a "quarter"; an "E.Z."), drug money

---

[19] *See also United States v. Carrera*, 259 F.3d 818, 830 (7th Cir.2001) (finding that in the 21 U.S.C. § 846 context, the Government need not prove that a defendant knew the quantity and type of controlled substance involved in the conspiracy, but rather, "[t]he government need only prove that the defendant was aware that some controlled substance was involved") (citing *United States v. Fragoso*, 978 F.2d 896, 902 (5th Cir. 1992)).

No. 12-30413

("bread"), and drug quality ("soda," and "hard").[20] The evidence on this count was sufficient for the jury to convict Daniels.

### 4.    *Thomas—Counts 6 and 7*

Thomas argues that the Government failed to offer sufficient evidence to support his convictions on Counts 6 and 7. On Count 6, Thomas was convicted of possession with intent to distribute a detectable amount of powder cocaine on July 2, 2010, in violation of §§ 841(a)(1) and (b)(1)(C). On Count 7, Thomas was convicted of possession with intent to distribute 500 grams or more of powder cocaine on July 13, 2010, in violation of §§ 841(a)(1) and (b)(1)(B)(ii). To convict a defendant of possession with the intent to distribute cocaine in violation of § 841, the Government must prove beyond a reasonable doubt that the defendant knowingly possessed cocaine that he intended to distribute. *See United States v. Cain*, 440 F.3d 672, 675 (5th Cir. 2006).  Because the quantity alleged under § 841(b)(1)(B)(ii) triggers a sentence enhancement, the Government was required to prove that the quantity of cocaine alleged in Count 7 was equal to or greater than 500 grams beyond a reasonable doubt. *See United States v. Gamez-Gonzalez*, 319 F.3d 695, 699-700 (5th Cir. 2003).

With respect to Count 6, the Government offered evidence that Mejorado, and JeCarlos met on the evening of July 1, 2010, to conduct a cocaine deal. The next day, Thomas drove to Shreveport to deliver the cocaine obtained from that deal. Officers followed Thomas to several locations, and they observed Mims drive into a driveway and park behind Thomas's car. Agent Sarpy observed Mims and Thomas meet at a doublewide trailer located on Miller Street, and observed Mims retrieve a package from Thomas's car. Wire intercepts of conversations between Mims, Thomas, and JeCarlos corroborate the

---

[20] The term "soda" indicates that baking soda or a similar substance had been used to "cut" the cocaine. The term "hard" indicates that the cocaine had been cooked into crack, i.e., it was "hard."

Government's theory that JeCarlos had arranged for Thomas to deliver cocaine to Mims on July 2, 2010.

With respect to Count 7, the Government presented evidence that the CI purchased cocaine from Pugh on July 13, 2010. Pugh testified that he thought he had received a half-kilogram of cocaine from Thomas that day, and sold half of what he received to the CI. Yet Thomas argues that this testimony is inconsistent with the crime lab finding that the net weight of the cocaine that the CI obtained from Pugh on July 13 weighed only 225.8 gross grams. Thus Thomas contends that because the lab finding yielded only 225.8 grams, if Pugh sold half of what he received to the CI, then Pugh had only 451.6 gross grams of cocaine total to begin with; less than the 500 grams for which Thomas was convicted. However, it is entirely possible that Pugh did not accurately weigh the amount he sold the CI. It is also possible that Pugh was shorting his customers and holding some back. Regardless, Pugh testified that he received a half of a kilogram from Thomas. The jury was free to credit Pugh and chose to do so regarding this transaction.

Viewing the evidence in the light most favorable to the prosecution, a rational juror could find that Thomas was guilty of possession with intent to distribute powder cocaine as described in Counts 6 and 7.

5.    *Tenisha—Counts 5 and 9*

Although the Government addresses challenges that Tenisha could have raised as to the sufficiency of the evidence to support her convictions on Counts 5 and 9 for unlawful use of a communication device in furtherance of the charged conspiracy, in violation of § 843(b), a thorough review of Tenisha's brief reveals that she challenges only her conspiracy conviction (Count 1). Tenisha discusses Counts 5 and 9 only insofar as they support the drug quantity finding relevant to Count 1. Although we need not address Tenisha's convictions on Counts 5 and 9 because she failed to challenge them on appeal, we note that even if she had

argued insufficient evidence as to these convictions, she would have failed in light of the well-documented wire intercept evidence presented at trial.

6.    *Furlow—Count 3*

Furlow argues that the evidence is insufficient to support his conviction on Count 3, for possession with intent to distribute powder cocaine in violation of §§ 841(a)(1) and (b)(1)(C).[21] Furlow contends that the Government failed to prove that he possessed with the intent to distribute a detectable amount of powder cocaine on May 6, 2010. Furlow concedes that the Government proved that he met Pugh on May 6 and discussed a planned exchange of powder cocaine on that day. Furlow argues, however, that the Government's evidence, including surveillance evidence, demonstrated that there was, in fact, no exchange of drugs between Pugh and Furlow on May 6, 2010.

Evidence at trial, chiefly intercepts of cell phone calls, shows that on May 6, 2010, Thomas delivered powder cocaine from JeCarlos to Pugh. After Thomas delivered the cocaine, JeCarlos called Pugh, asking him whether the delivery was "straight." During their conversation, Pugh acknowledged receipt of the drugs and JeCarlos instructed him to deliver an "E.Z." (i.e., an ounce) to Furlow. Two minutes after that phone call, Furlow called Pugh and said that JeCarlos told him to call Pugh about "getting something," and told Pugh to deliver it to him. About an hour later, Furlow called Pugh to discuss the quality of the cocaine Pugh had just delivered. Pugh informed Furlow that the cocaine was "in crumbs" and had been "hit," meaning that it had been adulterated with something other than cocaine (e.g., baking soda). Further conversation between Pugh and Furlow confirms that they were discussing the cocaine that Pugh had delivered earlier that day as Pugh explained that it had been broken up "all the

_____

[21] Again, the elements of possession with the intent to distribute cocaine in violation of § 841(a)(1) are (1) knowledge, (2) possession, and (3) intent to distribute cocaine. *See Cain*, 440 F.3d at 675.

No. 12-30413

way down with a hammer" when he received it.[22] Moreover, under cross-examination, Pugh described the actual transfer of cocaine to Furlow on May 6. Viewing the evidence in the light most favorable to the prosecution, a rational juror could find that Furlow was guilty of possession with intent to distribute powder cocaine on May 6, 2010.

### 7.    *Mims—Count 6*

Mims argues that the evidence was insufficient to support his conviction on Count 6, for possession with intent to distribute powder cocaine in violation of §§ 841(a)(1) and (b)(1)(C). Mims argues that the Government failed to prove that he actually possessed cocaine on July 2, 2010. As support, he states that although the Government presented evidence that Thomas traveled to Shreveport on July 2 and communicated and met with him and JeCarlos, the Government did not observe, seize, or purchase any cocaine that day. He concludes from the lack of evidence showing that he actually possessed cocaine on July 2, 2010, that the evidence was insufficient to support his conviction. We disagree.

Viewing the evidence in the light most favorable to the prosecution, we hold that a rational juror could find that Mims was guilty of possession with intent to distribute powder cocaine as described in Count 6. As discussed above,[23] the Government offered evidence that Mejorado, and JeCarlos met on the evening of July 1, 2010 and the next day Thomas drove to Shreveport to deliver the cocaine obtained from that deal. Officers followed Thomas to several locations, and they observed Mims park behind Thomas's car in a driveway. Agent Sarpy observed Mims and Thomas meet at a doublewide trailer and observed Mims retrieve a package from Thomas's car. Wire intercepts of

---

[22] "Breaking it down with a hammer" usually refers to a kilogram quantity of cocaine such that one uses a hammer to bust it open.

[23] *See supra* II.A.4.

conversations between Mims, Thomas, and JeCarlos corroborate the Government's theory that JeCarlos arranged for Thomas to deliver cocaine to Mims on July 2, 2010.

### 8.    *JeCarlos—Counts 2,4,6,7,10*

JeCarlos argues that his convictions on Counts 2, 4, 6, 7, and 10 are not supported by sufficient evidence. In Counts 2, 7, and 10, JeCarlos was convicted of possession with intent to distribute 500 grams or more of powder cocaine on May 6, 2010 (Count 2), July 13, 2010 (Count 7), and July 18, 2010 (Count 10), all in violation of §§ 841(a)(1) and (b)(1)(B)(ii). In Counts 4 and 6, he was convicted of possession with intent to distribute a detectable amount of powder cocaine on June 3, 2010 (Count 4) and July 2, 2010 (Count 6) in violation of §§ 841(a)(1) and (b)(1)(C).

Because the quantities alleged in Counts 2, 7, and 10 involved 500 grams or more of cocaine, that quantity triggers a sentence enhancement pursuant to § 841(b)(1)(B)(ii), and the Government must prove possession of 500 grams or more of cocaine beyond a reasonable doubt. *See Gamez-Gonzalez*, 319 F.3d at 699-700.

JeCarlos argues that we should overturn these convictions because the Government failed to offer sufficient evidence to prove beyond a reasonable doubt that (1) the quantity of cocaine involved in the transactions alleged in Counts 2 and 7 was 500 grams or more, and (2) failed to offer sufficient evidence that a detectable quantity of cocaine was involved in the transactions alleged in Counts 4 and 6. JeCarlos argues with respect to Count 10 that the Government failed to satisfy its burden of proving beyond a reasonable doubt that he possessed the cocaine on the date set forth in the indictment. We find all of these arguments unpersuasive.

Viewing the evidence in the light most favorable to the prosecution, we hold that a rational juror could find that JeCarlos was guilty of possession with

No. 12-30413

intent to distribute powder cocaine as described in the challenged counts. The evidence supporting JeCarlos's convictions on these counts is as follows.

With respect to Count 2, evidence shows that on May 6, 2010, Pugh received a shipment of cocaine from Thomas; at trial, Pugh testified that he thought the shipment was 27 ounces—approximately 756 grams. A recording of his phone conversation with Furlow on May 6 confirms the amounts to which Pugh testified at trial.

With respect to Count 4, the Government presented evidence obtained through direct surveillance and wire intercepts that on June 3, 2010, JeCarlos was in Shreveport while Thomas was delivering cocaine to various dealers. Evidence from wire intercepts also reveals that JeCarlos and Thomas were picking up drug money. The pole camera placed outside Pugh's residence recorded Thomas arriving at Pugh's house, and Pugh testified at trial that Thomas delivered some cocaine to him that day.

With respect to Count 10, the Government presented evidence that law enforcement officers recovered powder cocaine with a net weight of 784.5 grams from Pugh's residence after he was apprehended and began to cooperate with officers following a drug delivery from Thomas. Wire intercepts of phone calls between Pugh and JeCarlos confirm that Thomas delivered the drugs as per JeCarlos's request.

And JeCarlos's argument with respect to Counts 6 and 7 fails for the same reasons that Thomas's argument failed. *See supra* II.A.4.

While JeCarlos was careful not to touch the drugs, because constructive possession is possession under § 841,[24] we find that the considerable evidence

---

[24] Possession may be actual or constructive, and a defendant who "knowingly has ownership, dominion or control over [drugs] or over the premises in which [drugs are] concealed" has constructive possession of the drugs at issue. *United States v. Arnold*, 467 F.3d 880, 883 (5th Cir. 2006) (internal quotation marks and citation omitted).

No. 12-30413

linking JeCarlos to the charged offenses supports the jury's verdict. Accordingly, we affirm JeCarlos's convictions as to all of the substantive counts.

## B.    Business Records

All of the defendants except Daniels argue that the district court erred in admitting business records with declarations authenticating them under Federal Rule of Evidence 902(11) because the Government failed to give the written notice required under the version of Rule 902(11) that was in effect at the time of trial. We review the admission of evidence under Rule 902(11) using an abuse of discretion standard. *United States v. Olguin*, 643 F.3d 384, 390 (5th Cir. 2011). If we determine that the district court abused its discretion, we then review for harmless error. *Id.*

Rule 902(11) permits the admission of certified domestic records of a regularly conducted activity. Records sought to be authenticated through Rule 902(11) must meet the requirements of Rule 803(6)(A)-(C).[25] The version of Rule 902(11) in effect at the time of the defendants' trial provided that a party intending to offer a record into evidence under the rule "must provide written notice of that intention to all adverse parties, and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them." This language was amended in 2011, such that Rule 902(11) now provides that the party seeking to introduce the record into evidence provide "reasonable written notice" "[b]efore the trial or hearing." The changes to Rule 902(11) were "stylistic only." *See* FED. R. EVID. 902 advisory committee's note. Thus, under Rule 902(11), the authenticity of business records may be established by written

---

[25] That is, records authenticated under Rule 902(11) must be: (A) "made at or near the time by—or from information transmitted by—someone with knowledge"; (B) "kept in the course of a regularly conducted activity of a business"; and (C) made as "a regular practice of that activity." FED. R. EVID. R. 803(6)(A)-(C).

28

declaration of the custodian provided to opposing counsel a reasonable time before trial.

At the beginning of the second day of trial, the Government produced, for the first time, attestation documents it intended to use under Rule 902(11) to authenticate business records. Some of the records the Government sought to authenticate had been maintained in the names of the defendants, whereas others purported on their face to be records of other individuals. The defendants objected to the use of the attestation documents as to business records maintained in a name different from that of any of the defendants.

The parties then engaged in a lengthy discussion as to the admissibility of the attestation documents. The Government noted that the attestations were provided in response to grand jury or trial subpoenas that had been issued to various companies and that the business records had been provided to the defendants as discovery in fall 2010. The defendants acknowledged receipt of these records before trial, and they conceded that they had not filed a motion in limine to suppress or exclude these records. However, the defendants argued that the attestation documents were untimely, in violation of Rule 902(11). In response, the Government acknowledged that it had not sent a letter to the defendants giving notice of the attestation documents, and argued that any custodian called to testify and certify the business records would not be required to have personal knowledge regarding the accounts shown in the records, but would be testifying only as to custodial information about those records.

Following this discussion the district court suggested two possible solutions to the lack of timely written notice of the attestations: first, the district court stated that it could grant *instanter* subpoenas to have the record custodians come and testify and could attach an order to the subpoenas if necessary; second, the district court stated that it could grant a full day's continuance to allow defense counsel to evaluate the attestations and obtain

29

witnesses. After further discussion, the Government proposed that it would restructure its case so as not to use the attestations until three days after the defense raised its objection, arguing that three days would constitute sufficient notice under *Olguin*, 643 F.3d 384. No defense counsel submitted a request for an *instanter* subpoena or requested the one-day continuance offered by the district court. After three days, the Government introduced the various business records along with the contested attestations.

On appeal, the defendants argue that the three-day period between the time that the Government first gave notice of its intent to introduce certain business records by way of custodial attestation and the introduction of these records was insufficient to investigate and if necessary, challenge the accuracy and relevancy, of the declarations and underlying records. Defendants cite *United States v. Brown*, 553 F.3d 768 (5th Cir. 2008), in support of their argument that the records should have been excluded. In *Brown*, we held that a district court did not abuse its discretion in "refusing to give effect to [an] untimely offered affidavit" under Rule 902(11). *Id.* at 793. However, in *Brown*, two defendants attempted to admit certain of their own business records in an effort to demonstrate facts favorable to their claims of innocence, and the Government objected because no qualified custodian could introduce the records under Federal Rule of Evidence 803(b). *Id.* at 792. The defendants in *Brown* ultimately tried to use a Rule 902(11) affidavit to lay the foundation for their admission, but the Government objected to the affidavit as untimely. *Id.*

In contrast, the case before us more closely resembles *Olguin*. 643 F.3d 384. In *Olguin*, we held that the district court did not abuse its discretion in admitting phone records where the Government provided written notice of its intent to introduce those records five days before trial. *Id.* at 391. We further stated that the core issue in *Brown* regarding the business records was "the defense's inability to present a qualified witness to lay the foundation as to their

admission." *Id.* Admittedly, in *Olguin* the Government gave written notice before trial, but *Olguin* stands for the more general proposition that five days' notice is sufficient under Rule 902(11). *See id.* In the instant case, although the Government failed to give timely pretrial notice of its intention to use attestations to introduce the business records, the district court crafted two suitable remedies so as to afford the defendants the opportunity to test the adequacy of the foundations established by the declarations. The defendants did not avail themselves of these remedies. Moreover, the defendants had three days to assess the foundation of the business records the Government sought to introduce, a duration not materially unlike the five-day notice that we considered sufficient in *Olguin*. While it might not be the best practice to admit records upon three days' review in the midst of trial, we cannot say that it constitutes an abuse of discretion.

## III. CONCLUSION

For the reasons more fully set forth above, we AFFIRM the defendants' convictions on all counts. Because the evidence is insufficient to support the five kilogram quantity of cocaine alleged in Count 1, we VACATE defendants' sentences on that count and REMAND the case to the district court for resentencing pursuant to §841(b)(1)(B)(ii). We also VACATE Daniels's sentence on Count 8 and REMAND to the district court for resentencing pursuant to 21 U.S.C. § 843(b).

AFFIRMED in part; VACATED in part; REMANDED for resentencing.