## IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

No. 14-30962

UNITED STATES OF AMERICA,

United States Court of Appeals
Fifth Circuit

**FILED**

December 18, 2015

Lyle W. Cayce
Clerk

Plaintiff - Appellee

v.

DWAYNE REGINALD PATTERSON,

Defendant - Appellant

Appeals from the United States District Court
for the Middle District of Louisiana
USDC No. 3:12-CR-126

Before SMITH, WIENER, and GRAVES, Circuit Judges.

WIENER, Circuit Judge:*

Defendant-Appellant Dwayne Reginald Patterson was charged in a second superseding indictment with possession and attempted possession with intent to distribute five kilograms or more of cocaine on April 28, 2011, (Count 1) and with conspiracy to possess with intent to distribute five kilograms or more of cocaine on May 13, 2011, (Count 2). A jury convicted him of both counts. In this appeal, Patterson contends that the evidence was insufficient to prove

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

beyond a reasonable doubt that he possessed or attempted to possess five kilograms or more of cocaine or that he conspired with others to do so.

## I.

The government's investigation in this case involved a reverse-sting operation. In a reverse-sting operation, a person engages a government informant to purchase drugs. The purchaser gets his money together and—when the confidential informant and the purchaser meet to complete the transaction—the authorities arrest the purchaser. No narcotics are exchanged. A "flash" is used to set up a reverse sting. A flash is the first part of the operation, during which the purchaser is shown that the seller is legitimate and can complete the transaction.

The witnesses who testified for the government included case agent W. Brett Busbin; Patterson's codefendant, Clifford Honore; and a confidential informant (CI). The CI was a large-scale drug dealer working for judicial consideration. The instant investigation was initiated after the CI advised Busbin that Patterson was interested in purchasing cocaine.

### *The Flash*

A flash was set up in which the CI would be given real cocaine to show to Patterson, and Patterson would then decide whether to complete the transaction. The CI and Patterson exchanged a series of phone calls and decided to meet in Baton Rouge. The CI obtained 12 kilograms of cocaine for use in the flash and his body and car were rigged with video and audio equipment. An undercover officer, "Chico," participated in the meeting between the CI and Patterson, playing the part of a courier. Another undercover officer also participated as a courier. During the meeting, Agent Busbin was positioned to observe the CI's car.

No. 14-30962

*The First Meeting*

On April 28, 2011, the CI and Patterson met in the parking lot of a restaurant sometime after 2:00 P.M. At that time, the two men discussed the cocaine sale. Because Patterson was acting as a broker for other buyers, the CI asked Patterson whether those buyers wanted to look at the drugs or Patterson wanted to examine them. Patterson responded that a buyer wanted to look at the drugs; that the buyer was "ready on board" right now; and that he did not want to bring the buyer to the meeting. The CI understood that Patterson meant that the main buyer had the money and was ready to complete the transaction; however, Patterson did not want to bring the buyer to the meeting. Patterson spoke on the phone with someone whom the CI understood to be the buyer. Patterson told the CI that he expected to receive a sample of the cocaine. The CI and Patterson then drove to the parking lot of a hotel to meet Chico, the government agent who was posing as the cocaine source.

The CI called Chico and told him to bring the cocaine. Chico pulled up on the passenger side of the CI's car and passed a duffle bag containing the cocaine through the window of his car to Patterson, who put it in his lap. The duffle bag contained approximately 12 kilograms of cocaine, divided into separate bricks containing one kilogram each. The CI told Patterson to cut open a brick and to "slice it and dice it." Patterson did so, tasting the cocaine and remarking several minutes later that it "got [his] mouth numb." Patterson also took a sample of the cocaine and put it in a dollar bill, which he put in his pocket. After approximately four minutes, Patterson zipped up the duffel bag and handed it back to the courier, Chico.

The CI asked Patterson, "Now how long it's going to take to move on this here?" Patterson responded, "He can get it all today, but he just don't want it all at one time, like three or four." The CI understood from this statement that

No. 14-30962

Patterson's buyer wanted to purchase three or four kilograms of cocaine at a time. The CI persisted, "How many you trying to get?" Patterson responded, "We trying to get them all." The CI understood this statement to mean that Patterson's buyer was interested in buying "all [he] had." The CI asked Patterson how long it would be until his buyer was ready, and Patterson responded that he only needed to make a phone call and that "they ready." Patterson stated, "Their whole thing is, if it's good, they all gone." He suggested that both of his buyers could move the drugs; his nephew knew people. The CI suggested, "Why don't you get him to get three and the other guy to get three and that way it's half." Patterson responded, "I want them to get as much as they can, as they want, as long as they got the money." The CI asked again, "How long you think this might take?" Patterson responded that the buyer would begin purchasing the drugs after he had the "first one" and could vouch for it. The CI indicated that he was not willing to sell the cocaine one kilogram at a time, to which Patterson responded that he meant the first one only. The CI told Patterson that if he bought eight kilograms, he could get them for $21,500 "because they here with it now." Patterson responded that he had assured the buyer that he would buy the cocaine at a good price. Patterson then got out of the CI's car and ended the meeting, but the drug deal was not concluded that day.

*The Reverse*

The CI and Patterson met again in Baton Rouge, on May 13, 2011, to "do the actual reverse." Agent Busbin explained:

> The reverse . . . is when we would use the confidential informant or undercover to set up a series of phone calls for us and, ultimately, to meet up with the violator, and the violator would hope that the undercover actually had the cocaine to sell to him. They would come with the money, and we would then take them into custody.

4

In this transaction, no narcotics were used. The goal of the transaction was to learn the identity of Patterson's associates.

The CI and Patterson engaged in four phone calls, which led to a face-to-face meeting. The calls were recorded. Agent Busbin verified that the calls were made to Patterson's telephone number. In one call, Patterson told the CI "they ready" and "one guy wants them all." Patterson told him he "could come and look at the money." The CI told Patterson that he had 14 kilograms of cocaine for sale that day instead of 15 kilograms. Patterson said that his buyer could take 30 kilograms of cocaine per week. Additional calls were made to set a place where the transaction would be concluded.

The CI and Patterson parked their cars behind a restaurant and met for 15 minutes. The meeting ended, and the CI was escorted back to the agents' office. More phone calls between the CI and Patterson were made in an effort to complete the transaction.

At that time, the CI attempted to ascertain whether Patterson could actually broker the deal—"to see if he actually had somebody who was going to [be] able to produce enough funds to purchase the cocaine." Patterson said that he had two buyers for the cocaine: One had $50,000 and the other had $100,000. The CI participated in a three-way telephone call with Patterson and someone whom the CI understood to be a buyer. Still trying to "get the deal done," Patterson and the CI had two more phone conversations. In the second, Patterson stated that one buyer had confirmed that he had "100" and "they're coming." He also introduced a third buyer. Patterson stated that he intended to sell the cocaine for $24,000 per kilogram. The CI informed Patterson that a kilogram of cocaine would cost him $21,500 despite his higher price to his buyers. In still another call, Patterson mentioned that his buyers were coming

from different places. In a final call, Patterson mentioned that he had a new, different buyer.

The CI and the agents began to doubt that the transaction would be completed that day and called off the deal. Agent Busbin testified that he called off the operation because the place where Patterson wanted the CI to meet him was unsafe.

As the CI headed back to Texas, he received a call from Patterson that he was ready to complete the deal. Agent Busbin instructed the CI to return to Baton Rouge, and the CI was again wired with audio and video recording devices. At approximately 5:30 P.M., the CI went to a gated apartment complex on Corporate Boulevard in Baton Rouge, where Patterson, Percy Dominick, James Williams, Roger Perkins, Rueben Crawford, and Clifford Honore were waiting for him in several vehicles. Patterson had given the CI the code to enter the apartment complex parking lot; he advised the CI that the buyer would be standing by a white pickup truck. The CI went to the back of the parking area and parked near a white pickup truck.

Honore testified that Dominick recruited him into the drug conspiracy; both men worked as welders. Dominick asked him to get together some money. Honore had a couple of sources of money, including Perkins, a drug dealer, who lent him $20,000. Perkins drove the pickup truck to the apartment complex. Patterson went to meet Honore and Perkins when they arrived. Honore had the money in a plastic grocery bag in his pocket. Honore testified that when the CI arrived in a minivan, Patterson indicated "that was who I needed to show the money to." When Honore went to the passenger side of the minivan and attempted to get in, however, the CI panicked. Honore returned to the side of the truck. After Patterson went to speak with the CI, Patterson called

Honore over for a second time. Honore scratched a hole in the side of the bag in his pocket to show the CI that it contained money.

After that, Honore returned to the side of the truck. The CI left and, at some point, told the surveilling officers that the money was in the white truck, whereupon, the suspects were arrested. Honore tried to escape but was apprehended with $20,000 in cash and a gun. Perkins had $2,791. Although the authorities seized only $22,791 during the arrest, Agent Busbin stated that he thought Patterson and his clients wanted to purchase more cocaine but initially could come up with only enough cash to purchase a single kilogram. After selling that on the street, they would have enough money to purchase larger quantities.

## II.

Because Patterson moved for a judgment of acquittal after the government rested, and the defense rested without presenting evidence, our review is de novo.[1] "The jury's verdict will be affirmed if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt."[2] We do "not evaluate the weight of the evidence or the credibility of the witnesses, but view the evidence in the light most favorable to the verdict, drawing all reasonable inferences to support the verdict."[3]

## III.

To obtain a conviction under 21 U.S.C. § 841(a)(1), the government had to prove beyond a reasonable doubt that the defendant knowingly possessed

---

[1] *See United States v. Resio-Trejo*, 45 F.3d 907, 911 n.6 (5th Cir. 1995); *see also United States v. Daniels*, 723 F.3d 562, 569-70 (5th Cir. 2013).

[2] *United States v. Girod*, 646 F.3d 304, 313 (5th Cir. 2011) (internal quotation marks and citation omitted).

[3] *Id.*

a controlled substance with the intent to distribute it.[4] "To establish the offense of attempt to possess with intent to distribute a controlled substance, the government must show that the defendant knowingly took a substantial step toward possessing cocaine with the intent to distribute it."[5] "A substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent."[6]

To prove that the defendant conspired to distribute a controlled substance under 21 U.S.C. § 846, the government had to prove beyond a reasonable doubt: "(1) the existence of an agreement between two or more persons to violate narcotics laws; (2) the defendant's knowledge of the agreement; and (3) his voluntary participation in the conspiracy."[7] The agreement need not be explicit or formal to support a conspiracy conviction; it may be tacit and inferred from the circumstances.[8] "[A] culpable conspiracy may exist even though, because of the misapprehension of the conspirators as to certain facts, the substantive crime that is the object of the conspiracy may be impossible to commit . . . ."[9]

"If an indictment alleges involvement in a conspiracy to distribute an amount of a controlled substance that triggers enhanced penalties under §§ 841(b)(1)(A) or (B), then . . . the Government [must] prove beyond a reasonable doubt the quantity of the alleged drug as a fourth element of the

---

[4] *United States v. Cardenas*, 748 F.2d 1015, 1019 (5th Cir. 1984).

[5] *United States v. Thomas*, 690 F.3d 358, 369 (5th Cir. 2012) (internal quotation marks and citation omitted).

[6] *United States v. Mandujano*, 499 F.2d 370, 376 (5th Cir. 1974); *see also United States v. Oviedo*, 525 F.2d 881, 886 (5th Cir. 1976) (instructing that defendant's objective acts may not be equivocal in nature).

[7] *United States v. Valdez*, 453 F.3d 252, 256-57 (5th Cir. 2006).

[8] *United States v. McCullough*, 631 F.3d 783, 792 (5th Cir. 2011).

[9] *United States v. Robertson*, 659 F.2d 652, 657 n.2 (5th Cir. Unit A 1981) (internal quotation marks and citation omitted).

offense."[10] A fact that increases the mandatory minimum sentence is an element of the offense that must be submitted to the jury and found beyond a reasonable doubt.[11] The government's failure to prove drug quantity, however, does not undermine the conviction; it only affects the sentence.[12]

## IV.

As to Count 1, Patterson contends that he did not, as a matter of law, possess five kilograms or more of cocaine during the first meeting on April 28, 2011.  His contentions go to his lack of dominion over the 12 kilograms of cocaine, which were shown to him only briefly so that he could sample it.[13] Patterson's assertions with respect to actual possession ignore the fact that Count 1 charges him in the alternative with *attempted* possession of five kilograms or more of cocaine.

Patterson contacted the CI prior to the meeting to express an interest in purchasing cocaine, arranged and traveled to the meeting site, discussed rough price and quantity terms,[14] inspected, tested, and obtained a sample of the cocaine, and indicated that he was ready to purchase the cocaine as soon as he obtained the financing. A reasonable juror could have concluded that the government proved beyond a reasonable doubt that Patterson had taken

---

[10] *Daniels*, 723 F.3d at 570 (citation omitted) (citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000)).

[11] *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013).

[12] *Daniels*, 723 F.3d at 572, 581 (affirming convictions, vacating sentences on conspiracy count, and remanding for resentencing); *see also United States v. Daniels,* 729 F.3d 496 (5th Cir. 2013) (vacating sentences on substantive counts and remanding for resentencing).

[13] The government concedes that the evidence was insufficient to convict Patterson of possession. *See United States v. Delagarza-Villarreal*, 141 F.3d 133, 140 (5th Cir. 1997) (holding that "mere inspection [of a controlled substance] does not constitute possession, especially when [the person inspecting it] did not purchase the brick and returned it to the undercover agent").

[14] During the meeting, Patterson told the CI that he was trying to obtain all of the cocaine. The only price that the two men discussed was $21,500 per kilogram for quantities of eight kilograms or more.

a substantial step—several, in fact—toward purchasing quantities of cocaine that exceeded five kilograms on April 28, 2011. Accordingly, we affirm Patterson's conviction as to Count 1 for attempted possession with intent to distribute five kilograms or more of cocaine.

## V.

As to Count 2, Patterson asserts that the evidence did not show that he was guilty of conspiring to possess five kilograms or more of cocaine on May 13, 2011. He contends that the government failed to prove that he had an agreement with the CI with respect to the quantity of cocaine to be purchased and that, at the time of the drug transaction, he did not have the apparent ability to broker a five-kilogram purchase. His contentions go only to the adequacy of the government's proof as to drug quantity, and they are without merit.

Knowing that the CI had 14 kilograms of cocaine for sale, Patterson told the CI that one of the buyers wanted all of the cocaine and that one buyer could take 30 kilograms of cocaine per week. Patterson subsequently told the CI that one of his buyers had $50,000 and another buyer had $100,000. Together, these funds would have been more than sufficient to purchase five kilograms of cocaine. Although Patterson ultimately failed to broker a purchase of five or more kilograms of cocaine, the fact that he did not secure the financing necessary to complete the purchase does not conflict with a finding that he had agreed to broker the deal for five or more kilograms of cocaine, and that he worked long and hard to see it completed.[15]

The government presented evidence from which a reasonable juror could have concluded that the government had proved beyond a reasonable doubt

---

[15] *See United States v. Burke*, 431 F.3d 883, 886-87 (5th Cir. 2005) ("[F]or inchoate offenses, the quantity of drugs is based, not on the amount actually delivered, but on the amount agreed upon.").

that Patterson conspired with others to purchase five kilograms or more of cocaine on May 13, 2011. Accordingly, we affirm his conviction as to Count 2.

**AFFIRMED.**